# STATE OF TENNESSEE
## SUMMONS

### IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

Whistle Stop Farms, LLC
**Plaintiff**

_____
**Plaintiff**

CIVIL ACTION NO. 43984

**Service By:**
□ Sheriff
☒ Attorney
□ Sec. Of State
□ Comm. Of Insurance

**vs.**

The Board of Mayor and Aldermen for
**Defendant**
Thompson's Station, Tennessee

**Defendant**
c/o Corey Napier, Mayor of Thompson's Station, Tennessee

**Defendant**

**To the above named Defendant:** The Board of Mayor and Aldermen for Thompson's Station, Tennessee, c/o Corey Napier, Mayor of Thompson's Station, Tennessee, 2691 Pantall Road, Thompson's Station, Tennessee 37179.

You are hereby summoned and required to serve upon Douglas S. Hale, Esq. plaintiff's attorney, whose address is 231 Public Square, Suite 312, Franklin Tennessee 37064 _____, an answer to the complaint which is herewith served upon you within thirty (30) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

Witnessed and issued, Elaine B. Beeler, Clerk and Master for said Court at office this 25 day of March, 20 15.

_Debra Stevens_
**Clerk & Master**

### NOTICE:

**To the defendant(s):** Tennessee law provides a ten thousand dollar ($10,000.00) personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the terms you wish to claim as exempt with the clerk of the court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer. Mail list, including docket number, to: Clerk and Master, P.O.Box 1666, Franklin, TN 37065.

DEFT./WITNESS COPY

**EXHIBIT 1**

WHISTLE STOP FARMS, LLC )
    Petitioners )
                               )
vs. )
                               )
THE BOARD OF MAYOR AND ALDERMEN FOR )
THOMPSON'S STATION TENNESSEE )
    Respondent )

ENTERED

NO. 43984

## NOTICE

Pursuant to T.C.A. § 27-9-107, a PETITION FOR WRIT OF CERTIORARI

has been received and filed on March 20, 2015.

*Debra Stevens, deputy Clerk*
CLERK AND MASTER

I hereby certify that a true and correct copy of the foregoing document has been forwarded to:

The Board of Aldermen for Thompson's Station Tennessee
c/o Corey Napier, Mayor of Thompson's Station
2691 Pantall Road
Thompson's Station TN 37179

This 25 day of March , 2015.

*Debra Stevens, deputy Clerk*
CLERK AND MASTER

# IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

WHISTLE STOP FARMS, LLC,   )
                           )   2015 MAR 20  PH 4: 03
        Petitioner,        )
                           )   ENTERED_____
v.                         )
                           )   Case No. 43984
THE BOARD OF MAYOR AND     )
ALDERMEN for THOMPSON'S STATION,  )
TENNESSEE, acting on behalf of the  )
TOWN OF THOMPSON'S STATION,  )
TENNESSEE,                 )
                           )
        Respondent.        )

## WRIT OF CERTIORARI

TO: THE BOARD OF MAYOR AND ALDERMEN for THOMPSON'S STATION, TENNESSEE, acting on behalf of the TOWN OF THOMPSON'S STATION, TENNESSEE.

Whereas, Petitioner has filed a Petition for Writ of Certiorari and Writ of Supersedeas, under the above-styled caption, requesting that this Writ of Certiorari issue and require you to make, certify, and immediately file with the Court for examination and review, the entire record, including the recordings, transcripts, minutes, all public records, notices, letters, emails, papers, plans, plats, exhibits, maps, reports, memos, and submittal documents from applicants, consultants, citizens, government staff, or officials which were relied upon or are related in any way to the actions taken by the Board of Mayor and Aldermen for Thompson's Station, Tennessee's in issuing its decision made during the public meeting on February 10, 2015, to revoke the sewer taps having previously been approved and granted to Petitioner by the Municipal Planning Commission for Thompson's Station, Tennessee.

THEREFORE, YOU ARE HEREBY COMMANDED, pursuant to Tenn. Code Ann. § 27-9-109, to make, certify, and immediately file with the Court for examination and review, the entire record, including the recordings, transcripts, minutes, all public records, notices, letters, emails, papers, plans, plats, exhibits, maps, reports, memos, and submittal documents from applicants, consultants, citizens, government staff, or officials which were relied upon or are related in any way to the actions taken by the Board of Mayor and Aldermen for Thompson's Station, Tennessee's in issuing its decision made during the public meeting on February 10, 2015, to revoke the sewer taps having previously been approved and granted to Petitioner by the Municipal Planning Commission for Thompson's Station, Tennessee, and make return of this Writ showing how you have obeyed the same within 30 days of issuance.

ENTERED this _23rd_ day of _MARCH_ 2015.

_____
CHANCELLOR or
CLERK AND MASTER


Approved for Entry:

HALE AND HALE, PLC

_____
Douglas S. Hale, BPR #6669
Kathleen Hale McClellan, BPR #28724
231 Public Square, Suite 312
Franklin, Tennessee 37064
(615) 794-1312
(615) 790-9236-fax
kathleen@haleandhale.com
Counsel for Petitioner

# IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

WHISTLE STOP FARMS, LLC,  )
)
    Petitioner,  )
)
v.  )
)
THE BOARD OF MAYOR AND  )
ALDERMEN for THOMPSON'S STATION,  )
TENNESSEE, acting on behalf of the  )
TOWN OF THOMPSON'S STATION,  )
TENNESSEE,  )
)
    Respondent.  )

RECEIVED BY
Judges' Chambers
Date: *3-23-15*

2015 MAR 20 PM 4: 03

ENTERED_____

Case No. *43984*

## WRIT OF SUPERSEDEAS

Whereas, Petitioner has filed a Petition for Writ of Certiorari and Writ of Supersedeas, under the above-styled caption, requesting that a Writ of Supersedeas issue. The Court finds that the decision made by the Board of Mayor and Aldermen for Thompson's Station Tennessee on February 10, 2015, which revoked the 46 sewer taps in relation to the development of Whistle Stop Phase I, caused a material change in the status of the development of Whistle Stop Phase I, which has negatively affected the Petitioner. The Court finds that it is appropriate to issue a Writ of Supersedeas, pursuant to Tenn. Code Ann. § 27-9-106 (a), maintaining the status quo and staying the effect of the Board of Mayor and Aldermen's decision made on February 10, 2015, revoking the 46 sewer taps in relation to Whistle Stop Phase I. The Court further finds that to maintain the status quo, all prior approvals having been granted and permits issued to the Petitioner by the Town of Thompson's Station, Tennessee, its agencies, boards, commissions, administrators or delegates, shall not expire during the pendency of this cause, including, but not limited to, the Preliminary Plat and the Grading Permit.

IT IS HEREBY ORDERED that the status quo shall be maintained and the effect of the Board of Mayor and Aldermen's decision made on February 10, 2015, revoking the 46 sewer taps in relation to Whistle Stop Phase I, shall be stayed, pending further orders of the Court.

IT IS FURTHER ORDERED that prior approvals having been granted and permits issued to the Petitioner by the Town of Thompson's Station, Tennessee, its agencies, boards, commissions, administrators or delegates, shall not expire during the pendency of this cause, including, but not limited to, the Preliminary Plat and the Grading Permit, pending further orders of the Court.

IT IS FURTHER ORDERED that Petitioner shall post a good and sufficient bond in the amount of $1,000.00 _____, to indemnify the Board from any injury that may result by reason of granting the Writ of Supersedeas.

ENTERED this _23_ day of _March_, 2015.

_____
CHANCELLOR

Approved for Entry:

HALE AND HALE, PLC

_____
Douglas S. Hale, BPR #6669
Kathleen Hale McClellan, BPR #28724
231 Public Square, Suite 312
Franklin, Tennessee 37064
(615) 794-1312
(615) 790-9236-fax
kathleen@haleandhale.com
Counsel for Petitioner

# IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

WHISTLE STOP FARMS, LLC, )
)
Petitioner, )
)
v. )
)
THE BOARD OF MAYOR AND )
ALDERMEN for THOMPSON'S STATION, )
TENNESSEE, acting on behalf of the )
TOWN OF THOMPSON'S STATION, )
TENNESSEE, )
)
Respondent. )

RECEIVED BY
Judges' Chambers
Date: 3-23-15

Case No. 43984

## PETITION FOR WRIT OF CERTIORARI AND WRIT OF SUPERSEDEAS

COMES NOW the Petitioner, Whistle Stop Farms, LLC, by and through its legal counsel, and brings this action pursuant to Tenn. Code Ann. § 27-9-101 et seq. and hereby petitions this Court to issue a Writ of Certiorari (hereinafter the "Writ") and Writ of Supersedeas for the review of the official decision of the Board of Mayor and Aldermen for Thompson's Station, Tennessee, acting on behalf of the Town of Thompson's Station, Tennessee, revoking sewer taps having been previously approved by its Municipal Planning Commission in furtherance of the development of Whistle Stop Phase I. Petitioner alleges the following as the basis for the issuance of the Writ:

### Parties, Jurisdiction and Venue

1.      The Petitioner, Whistle Stop Farms, LLC, is a Tennessee limited liability company, having its principal place of business located at 144 Southeast Parkway, Suite 230, Franklin, Williamson County, Tennessee. Petitioner is in the business of owning, improving and developing real property and is the owner of the real property that is the subject of this cause.

2.     Respondent, the Board of Mayor and Aldermen for Thompson's Station, Tennessee (hereinafter the "Board") acts on behalf of the Town of Thompson's Station, Tennessee (the "Town"). The Board created the Thompson's Station Municipal Planning Commission (hereinafter the "MPC") and delegated to it the land use planning function of the Town. Tenn. Code Ann. § 13-4-101.

3.     The Board may be served with process upon the Corey Napier, Mayor of Thompson's Station, Tennessee, 2691 Pantall Road, Thompson's Station, Tennessee 37179. Tenn. R. Civ. Pro. Rule 4.04(8).

4.     Jurisdiction and venue are proper in the Chancery Court for Williamson County, Tennessee. Tenn. Code Ann. § 13-4-101.

Facts

5.     On December 4, 2012, Petitioner purchased real property consisting of approximately 142.47 acres located in the Town at 1565 Thompson Station Road W, Thompson's Station, Tennessee 37179 (hereinafter the "Property") for the purpose of developing a proposed 343 lot, multi-section residential subdivision to be known as "Whistle Stop".

6.     Whistle Stop Phase I is the portion of Whistle Stop that is the subject of this Writ and is proposed to contain 46 residential lots (hereinafter "Phase I").

7.     The Thompson's Station Municipal Code (hereinafter the "TSMC") contains the codified and revised ordinances of the Town and specifically provides developers with the policies and procedures required for submission of preliminary plats and requests to extend or connect to the public sewer. TSMC Title 18.

8.      On October 22, 2013, the MPC considered and approved with certain contingencies, the Preliminary Plat for Whistle Stop Phase I (hereinafter the "Preliminary Plat").

9.      On October 22, 2013, the MPC carefully considered and approved Petitioner's request for connection to the Town's sewer system to service Phase I, specifically stating in its record of action the following:

> "Sewer availability was granted by the Planning Commission for Phase 1 of Whistle Stop only up to 46 units based upon the current capacity in the Heritage Commons facility. Pursuant to the Town's ordinances, the developer shall be responsible for all costs of planning, design and construction of any improvements necessary to transport wastewater to Town treatment facilities. The Town cannot confirm that sewer capacity is available for the remainder of the proposed development at this time" (hereinafter the "Sewer Approval").

Complete and exact copies of the Preliminary Plat, the record of action of the MPC and the minutes from the October 22, 2013 MPC meeting, are attached hereto, marked as Collective Exhibit A and are incorporated herein by reference.

10.     On June 30, 2014, the Town, through its engineering consultant, certified that the Development Plans for Whistle Stop Section 1A, which included, among other things, utility plans and sanitary sewer plans (hereinafter the "Development Plans"), were in compliance with all Town and other associated regulations.

11.     On June 30, 2014, the Town issued a Grading Permit authorizing Petitioner to begin "grading, installing roadways, storm drainage systems, utilities and erosion control devices…" for Whistle Stop Section 1A (hereinafter the "Grading Permit"). A complete and exact copy of the Grading Permit is attached hereto, marked as Exhibit B and is incorporated herein by reference.

12.     On July 8, 2014, the Tennessee Department of Environment & Conservation Division of Water Pollution Control (hereinafter "TDEC") considered and approved the Development Plans for construction. A complete and exact copy of the Development Plans is attached hereto, marked as Exhibit C and is incorporated herein by reference.

13.     Upon obtaining the Sewer Approval, and in reliance on the approvals of the Preliminary Plat and the Development Plans and the issuance of the Grading Permit, Petitioner commenced work on the Property in furtherance of the development and incurred costs, expenses and obligations associated with the development of Phase I in the approximate amount of $1,034,079.20, including approximately $115,000.00 in sewer tap fees for sewer connections in Phase I and approximately $3,430.00 for sewer capacity fees for all 343 lots in Whistle Stop.

14.     In January 2015, The Town, by and through its Town Administrator, Joe Cosentini, advised Petitioner that it would be required to re-submit its request for Sewer Approval to the Board.

15.     Mr. Cosentini advised Petitioner that the re-hearing was simply a formal way to correct a procedural oversight and assured Petitioner that the Board should re-approve the Sewer Approval.

16.     Mr. Cosentini wrote to the Board on February 4, 2015 and recommended the re-approval of the Sewer Approval.

17.     On February 10, 2015, the Board held a public meeting and revoked the Sewer Approval because the Board decided it wanted to "start all over from the top of Whistle Stop" (hereinafter the "Board's Final Decision").

18.     Petitioner has a special interest in the Board's Final Decision and is subject to special injury not common to the public.

19.     The MPC has broad power to perform its purposes and promote municipal planning. Tenn. Code Ann. §13-4-103.

20.     The MPC has the specific power to review and approve proposed construction affecting public streets and spaces, among other public interests and to approve the location and the extent of public utilities. Tenn. Code. Ann. §13-4-104.

21.     The TSMC provides developers with the policies and procedures required for submission of requests to extend or connect to the public sewer. TSMC Title 18.

22.     The TSMC provides that extensions and connections to the public sewer require approval of TDEC and the Town's designated agent. TSMC Title 18-117.

23.     The TSMC requires that preliminary plats be submitted to the MPC for approval. TSMC Title 18-119.

24.     The TSMC does not grant authority to the Board to consider, review or approve requests for extensions and connections to the public sewer.

25.     Tennessee law does not grant authority to the Board to consider, review or approve requests for extensions and connections to the public sewer unless the MPC has first disapproved the request. Tenn. Code Ann. §13-4-104.

26.     Petitioner submitted its request for sewer approval in compliance with the TSMC and, the MPC, in performing the duties delegated it by the Board and within the authority granted it by statute and by the TSMC, approved Petitioner's request.

27.     The Board's Final Decision was illegal because the Board acted without authority and exceeded its jurisdiction when it reviewed and considered the MPC's Sewer Approval.

28.     If this Court finds that the Board did have the authority to review and consider the MPC's Sewer Approval, Petitioner would state that the Board's Final Decision was arbitrary, capricious and unsupported by material evidence.

29.     Petitioner requests that this Court, pursuant to Tenn. Code Ann. § 27-9-106, issue a Writ of Supersedeas to prevent the Town and its agencies, boards, commissions, administrators or delegates, from revoking any previously approved requests of Petitioner which relate to Whistle Stop and to maintain the status quo so that prior approvals do not expire during the pendency of this cause, including, but not limited to, the Preliminary Plat and the Grading Permit.

PREMISES CONSIDERED, Petitioner requests the following relief:

1.  That a Writ of Certiorari be issued and remain in effect, requiring the Respondent to certify and immediately file with the Clerk and Master of this Court, the official record from the Board's meeting on February 10, 2015;

2.  That process and notice be issued to the Respondent pursuant to Tenn. Code Ann. §27-9-107, and that Respondent be required to answer within 60 days of the filing of the official record from the Board's meeting on February 10, 2015;

3.  That upon the hearing of this cause, this Court find that the Board lacked authority to review and consider the Sewer Approval and order the Board's Final Decision to be null and void, or otherwise order its reversal, and reinstate the Sewer Approval;

4. That upon the hearing of this cause, this Court find that the Board exceeded its jurisdiction and acted unlawfully when it reviewed and considered the Sewer Approval and order the Board's Final Decision to be null and void, or otherwise order its reversal, and reinstate the Sewer Approval;

5. That, in the event this Court finds that the Board had the authority to review, consider and revoke the Sewer Approval, this Court find that the Board's Final Decision was arbitrary, capricious and unsupported by material evidence;

6. That this Court find that the Petitioner acquired vested rights pursuant to the Sewer Approval and upon the issuance of the Grading Permit and order that the Board be estopped from revoking the Sewer Approval;

7. That a Writ of Supersedeas, pursuant to Tenn. Code Ann. § 27-9-106 (a), maintaining the status quo of all approvals having been granted the Petitioner by the Town, its agencies, boards, commissions, administrators or delegates, and staying the effect of the Board's decision revoking the 46 sewer taps in relation to Phase I, be issued by the Chancellor and remain in effect until otherwise ordered by this Court; and

8. That Petitioner reserves the right to amend and seek additional relief, damages, or other remedies.

9. That Petitioner be granted such further relief as deemed necessary and appropriate by this Court.

**THIS IS THE FIRST APPLICATION FOR A WRIT IN THIS MATTER.**

Respectfully submitted,

HALE AND HALE, PLC

Douglas S. Hale, BPR #6669
Kathleen Hale McClellan, BPR #28724
231 Public Square, Suite 312
Franklin, Tennessee 37064
(615) 794-1312
(615) 790-9236-fax
kathleen@haleandhale.com
Counsel for Petitioner

# VERIFICATION

STATE OF TENNESSEE      )
COUNTY OF WILLIAMSON     )

    I, J. N. Franks, III, after first having been duly sworn according to law, do hereby acknowledge that I, as the Managing Member of Whistle Stop Farms, LLC, have read the foregoing Petition for Writ of Certiorari and Writ of Supersedeas and hereby state that the same is true and correct to the best of my knowledge, information and belief.

    Witness my hand, at office, this 20th day of March, 2015.

WHISTLE STOP FARMS, LLC


By: _____
    J. N. Franks, III
    Managing Member

Sworn to and subscribed before me on this 20th day of March, 2015.

_____
Notary Public

My Commission Expires: 11/5/2017

*[Notary seal: LAUREN W. MOSS — STATE OF TENNESSEE — NOTARY PUBLIC — WILLIAMSON COUNTY]*

# COLLECTIVE EXHIBIT A
(Preliminary Plat, the record of action of the MPC and the minutes from the
October 22, 2013 MPC meeting)



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
PRELIMINARY PLAT

Case 3:16-cv-03309   Document 1-3   Filed 12/28/16   Page 17 of 86 PageID #: 20



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION RD.
PRELIMINARY PLAT

Case 3:16-cv-03309   Document 1-5   Filed 12/28/16   Page 18 of 86 PageID #: 21

# Town of Thompson's Station
## Municipal Planning Commission
## Minutes of the Meeting
### October 22, 2013

### Call to Order

The meeting of the Municipal Planning Commission of the Town of Thompson's Station was called to order at 7:00 p.m. on the 22nd day of October, 2013, at the Thompson's Station Community Center with the required quorum. Members and staff in attendance were: George Ross, Chair; Tom Evans, Secretary; Carl Hubert, Commissioner; Sarah Benson, Commissioner; Jack Elder, Commissioner; Willis Gilliam, Commissioner; Brad Wilson, Commissioner; Greg Langeliers, Town Administrator; Wendy Deats, Town Planner; Doug Goetsch, Town Finance Director; Richard King, Building Official; Town Attorney Todd Moore; and Leah Rainey, Town Recorder.

### Consideration of the Minutes.

The minutes from the September 24th, 2013 meeting were previously submitted. Commissioner Evans moved for approval of the minutes as submitted. The motion was seconded and carried unanimously.

### Announcements by Staff.

Mr. Langeliers reminded everyone that the November Planning Commission meeting had been rescheduled for November 19th at 7:00 p.m. in the Community Center.

—

Mrs. Deats recapped various park improvements that had been completed.

### Old Business.

**Update on Mars mechanical equipment**—Mrs. Deats said staff Mars had presented a plan for screening rooftop equipment after concerns had been raised by Planning Commissioners about its visual impact. She said staff had reviewed the plan and felt it was satisfactory.

Commissioner Wilson moved to approve the new screening as an amendment to the previously approved site plan. The motion was seconded and carried unanimously.

### FINAL PLAT:

1. Section 2B for the creation of 26 single-family lots and 3 open space lots in Bridgemore Village (File: 1-D-13-007)

Mrs. Deats reviewed her staff report and recommended approval based on the project's consistency with the development agreement for Bridgemore Village, the town's Zoning Ordinance, Subdivision Regulation and open space requirements. She recommended approval with the contingencies that, prior to recordation of the final plat, a Letter of Credit in the amount of $138,000 be submitted for roads, grading drainage and erosion control, and a Letter Credit in the amount of $36,000 be submitted for sewer.

Commissioner Elder moved for approval with staff's recommended contingencies. The motion was seconded and carried unanimously.

**PRELIMINARY PLAT:**

## 2. Whistle Stop (File: 1-C-13-011)

Mrs. Deats reviewed her staff report and said staff required some additional information for a traffic study. The applicant has retained an engineer to do the traffic study per the town's requirements. She also said she had some concerns about lot widths and would recommend increasing them to 50 feet.

Mrs. Deats said she had no other concerns but she could not recommend approval without the issuance of a sewer availability letter. She said the applicant and staff were available for questions.

Commissioner Ross asked about off-site water availability. Mrs. Deats said preliminary design plans were in the works; HB&TS had indicated they would provide service.

Commissioner Ross asked how long it would take to get a comprehensive traffic study. Applicant representative Greg Gamble said he expected to outline the scope of the traffic study within a week and that the engineer would be recommending appropriate timing for incremental improvements.

Mr. Gamble gave a PowerPoint presentation overview of the plan.

The Commission discussed water flow and drainage, placement of HVAC units, lot widths and access.

**After discussion, Commissioner Ross moved to defer until next month to give the applicant a chance to work further on the traffic study.**

Commissioner Evans said he wanted to have a discussion about sewer availability and whether the town's facilities had capacity to accommodate this development.

Mr. Langeliers said the capacity of the treatment plant was roughly 15,000 gallons per day according to numbers from HB&TS, and it is permitted for 30,000 gallons per day. Based on those assumptions, Heritage Commons has some capacity. However, there were still some vacant lots in Heritage Commons that would require capacity if they were developed. Mr. Langeliers said that a highly conservative perspective could find that there is not enough capacity, while a more liberal perspective could find that there is capacity.

Commissioner Gilliam asked how much this development would owe in tap fees.

Mr. Langeliers said about $1.8 million.

Commissioner Gilliam asked if that would be enough money to fix the sewer problems, assuming there were any.

Mr. Langeliers said it could go along way toward fixing problems or even potentially be used to construct a new facility.

Commissioner Gilliam said, given that the Heritage Commons facility was operating at roughly half of its treatment capacity, it seemed there was at least enough capacity for the first phase of Whistle Stop.

**Commissioner Ross withdrew his motion.**

Commissioner Benson asked Mr. Gamble for some input on how the town might increase capacity at the Heritage Commons facility, whether that might include additional equipment, property acquisition, or other means.

Mr. Gamble said some options included building a third cell or adding additional drip fields.

Commissioner Benson asked who would bear the cost of the improvements.

Mr. Gamble said $2,400 per lot would be paid to the town for system development, and he thought there were some opportunities for partnerships with the town.

Commissioner Benson asked what the anticipated timeline was for buildout.

Mr. Gamble said a year and a quarter or so for the first phase; 5-6 years total for the project.

Applicant Jay Franks said he thought it was important for the town to determine a long-range plan that included incremental expansions and improvements as further development occurs. He asked that the Commission consider permitting the first 46 lots while further investigating and planning for future and long-term sewer availability. He said he was willing and prepared to pay fees for the necessary improvements.

Commissioner Benson said it was unclear whether the current fees were adequate; that's why she wanted to know more about the projected timeline.

She then discussed the potential future road through privately owned property.

Mr. Franks said he personally didn't feel a secondary access was needed, but since the town had requested it they were showing it on the preliminary plat in case it was needed.

Commissioner Benson referred to Mr. Franks' letter to the commissioners and board members which suggested that the town may need to implement a moratorium.

Mr. Franks said operating sewer as a utility was a big responsibility for the town and if the town was not prepared to grant further capacity, an official moratorium ought to be enacted. He said it was something that needed to be a priority and be worked on in a systematic way.

Commissioner Benson said she thought the town had done a lot of work toward resolving issues with TDEC and repairing cell two.

Commissioner Wilson said he wouldn't have a problem approving the initial 46 lots if the Heritage Commons facility could handle that volume. He said the town was at a crossroads with regard to development and that a group of experts, engineers and city officials should look further into the sewer issues soon and help design some long-range plans. He said the next five or ten years could bring sewer demands beyond the current capacity, so it needed to be looked at.

Mr. Gamble said the applicant would be comfortable with an incremental sewer availability letter.

**Commissioner Gilliam moved for a short recess. The motion was seconded and carried unanimously.**

The meeting reconvened at 8:16 p.m.

Commissioner Wilson made a motion to approve the preliminary plat for the first 46 lots of Whistle Stop with the following contingencies: 1) that lot widths be increased to 50 feet and that setbacks for the primary structures be consistent with 5 feet on the sides and 20 feet in the rear, with rear-yard garages allowed a zero lot line setback ; 2) that the traffic study be completed per the scope set by town staff; 3) a development agreement be entered into by the applicant; 4) a schedule for off-site water improvements be submitted; 5) the location of the lift station be determined by staff; 6) payment of preliminary platting fees and sewer fees. The motion was seconded and carried unanimously.

## DEVELOPMENT PLAN:

### 3. Clayton Arnold Residential Project (File: 1-A-13-005)

Mrs. Deats introduced the project and reviewed her staff report. She said the applicant was aware that no entitlement was granted with the review of a development plan. She said the project was in compliance with the codes as a cluster development and recommended the Planning Commission direct him to move forward in the process.

The applicant Daniel Woods discussed his project and said he understood that there was no guarantee of sewer availability at this point and that he was moving forward on the project at his own risk.

After discussion, Commissioner Gilliam made a motion to direct the applicant to proceed. The motion was seconded and carried unanimously.

## ZONING ORDINANCE AMENDMENT:

### 4. Amendments to the Zoning Ordinance (File: 6-A-13-011)

Mrs. Deats reviewed her staff report and outlined the changes since first reading of the ordinance by the Board of Mayor and Aldermen, including sections on transfer of density, definitions, and open space requirements, which had been reverted back to 50 percent at the request of a board member.

Commissioner Gilliam said the vote was unanimous at First Reading with open space at 45 percent, which is what the Planning Commission has recommended.

Commissioner Evans said 50 percent was really high for an open space requirement.

Mrs. Deats said she could go back to the board and say that the Planning Commission asked that the 45 percent be reconsidered.

Mr. Moore said the Planning Commission could make a recommendation to accept the amendments as submitted, to not accept them, or to accept them with changes. The board could decide to accept or reject the Planning Commission's recommendation.

Mr. Langeliers said 45 percent had passed unanimously with no discussion at first reading; the board would have a chance to request the modification to 50 percent by bringing it up at second reading before final vote.

Commissioner Evans requested a definition be added for modular homes.

Commissioner Evans discussed density and pointed out that property lines often go to the center of roads

in Thompson's Station, and he felt that rights-of-way should be included when calculating density because the property owners are paying taxes on that property.

Mr. Moore said it was typical to exclude area in a right-of-way even if the underlying property goes to the center line of a road, because it is impossible to build density in that space. Many jurisdictions measure setbacks from the right-of-way and give credit for what is dedicated. "Any other encumbrances" was somewhat vague and could use further clarification.

Mrs. Deats noted that the Commission had requested flood plains and hillsides be included in density calculations; she could work with Mr. Moore on some additional language that would also include easements and rights-of-way.

Alderman Cooper, who was in the audience, said she felt the town needed to be careful about excluding certain types of property in density calculations because other jurisdictions in the area didn't do that.

Mr. Langeliers said for the vast majority of developments, the difference such exclusions make in terms of density wouldn't be more than one or two units. He said he didn't consider it would have a marked impact either way.

Mr. Moore noted that if the town wants to encourage trails, then giving density credit for dedication of public rights-of-way is a good incentive. If the town calculates density on the gross acreage, that incentive would not be there. He added that it was pretty standard to not give credit for the ground under the pavement of existing roadways.

**After further discussion, Commissioner Gilliam moved to recommend the Zoning Amendments to the Board of Mayor and Alderman with the changes that 1) the Open Space requirement be reverted back to 45 percent, 2) that the exclusions for calculating density be stricken, so that the definition reads "the total number of residential units permitted on a gross acre of land" and 3) the addition of the modular home definition. The motion was seconded and carried unanimously.**

**New Business.**

**Adjourn.**

There being no further business, the meeting was adjourned at 9:22 p.m.

Signed: _____          Attest: _____

George Ross, Chair                                         Tom Evans, Secretary

# EXHIBIT B
(Grading Permit)

# Town of Thompson's Station

Permit No. _107_

# Grading Permit

Issuance of this permit constitutes authorization by the Town of Thompson's Station to begin grading, installing roadways, storm drainage systems, utilities and erosion control devices on the following site:

Development Name: _Whitestop Ridge PSPA_

Location: _Whitestop Ridge PSPA_

Developer: _Whitestop Ridge PSPA_

Contractor: _Enterprise Const._ TN Lic. No. _29119_

_____        _____
City Official                                    Date
                                                        _6-30-14_

This permit shall be enclosed in a transparent waterproof envelope and shall be displayed on site in a clearly visible location. Unless otherwise granted by written permission, this permit expires nine (9) months from the date shown above. By signature above, the Contractor acknowledges that he/she is well acquainted with the construction plans for this project and the required installation and maintenance of erosion control devices. Additionally, the contractor acknowledges that he/she is well aware of necessary safety precautions (protective clothing, utility trench stabilization, flashing lights, barricades, etc.) for the protection of both employees and the general public. Failure to maintain proper safety procedures and erosion control will be sufficient cause for the Town to place a STOP WORK ORDER on this project. THIS PERMIT IS SUBJECT TO ANY ATTACHED CONDITIONS.

# EXHIBIT C
### (Development Plans)

# DEVELOPMENT PLANS
## FOR
## WHISTLE STOP
1565 THOMPSON STATION RD.
WILLIAMSON COUNTY, TN 37206

JUNE 16, 2014



SITE LOCATION &
CONTROL POINTS MAP
NTS




VICINITY MAP
SCALE 1"=xxx'

## INDEX OF DRAWINGS:

- C0.0 TITLE SHEET
- C0.1 EXISTING CONDITIONS
- C1.0 SITE PLAN
- C1.1 SITE PLAN DETAILS
- C1.2 SITE PLAN DETAILS
- C1.3 ESPC PLAN PHASE 1
- C1.4 ESPC PLAN PHASE 2
- *C1.4 ESPC PLAN PHASE 2
- C1.5 TEMPORARY SEDIMENT POND 1 DETAIL
- C1.5.1 TEMPORARY SEDIMENT POND 2 DETAIL
- C1.6 DRAINAGE AREAS PLAN
- C2.0 MASS GRADING PLAN
- C2.1 BURGIN LANE PLAN & PROFILE
- C2.2 BRAKEMAN LANE PLAN & PROFILE
- C2.3 UNION STATION ROAD PLAN & PROFILE
- C2.4 FLAGSTAFF LANE PLAN & PROFILE
- C3.0 STORMWATER MANAGEMENT PLAN
- C3.1 WATER QUALITY SWALE PLAN & PROFILE
- C4.0 UTILITY PLAN
- C4.1 UTILITY DETAILS
- C5.1 SANITARY SEWER LINE 1 & 2
- C5.2 SANITARY SEWER LINE 1 & 2
- C5.3 SANITARY SEWER LINE 3 PROFILE PLAN
- C5.4 SANITARY SEWER LINE 4 PROFILE PLAN
- C5.5 SANITARY SEWER FORCE MAIN
- C5.6 NOT USED
- C5.7 PUMP STATION - WET WELL
- C5.8 SANITARY SEWER DETAILS
- L1 LANDSCAPE PLAN

## NOTES

## DEVELOPMENT SUMMARY

## HORIZONTAL & VERTICAL CONTROL INFORMATION

Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 27 of 86 PageID #: 30




DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
TITLE SHEET

SHEET C0.0

REVISIONS
| | | |
|---|---|---|
| 3 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 |
| 2 | REVISED PER T.O.T.S. PLANNING COM. | 10-22-13 |
| 1 | REVISED PER T.O.T.S. | 06-18-14 |
| 0 | REVISED PER T.O.T.S. | 05-20-14 |

TNR 148927



100 YEAR FLOOD PLAIN
PRE-CONSTRUCTION
797.29

SECTION 1A

100 YEAR FLOOD PLAIN
PRE-CONSTRUCTION
795.60

100 YEAR FLOOD PLAIN
PRE-CONSTRUCTION
799.35

SECTION 1B

WET WEATHER CONVEYANCE
WITH 25' BUFFER
50' TOTAL

SECTION 1A
AREA=
394,511.09 SF
9.06 AC

100 YEAR FLOOD PLAIN
PRE-CONSTRUCTION
100 YEAR FLOW: 820.70 CFS
100 YEAR FLOOD PLAIN ELEVATION - 792.56

SECTION 1A

SECTION 1A

FUTURE
SECTION 1B

SECTION 1A

FENCE

15' BUFFER

15' BUFFER

MANG STREAM

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
EXISTING CONDITIONS

REVISIONS
| 3 | REVISED PER T.O.T.S. PLANNING COM. | 10-22-13 |
| 4 | REVISED PER T.O.T.S. | 06-16-14 |
| 5 | REVISED PER T.O.T.S. | 06-25-14 |
| 6 | REVISED PER T.O.T.S. | 06-30-14 |

COMPUTER FILE

TNR 149927



Case 3:16-cv-03309   Document 1-3   Filed 12/28/16   Page 29 of 86 PageID #: 32

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
SITE PLAN



DOUBLE INLET DETAIL

TYPICAL ROADWAY SECTION

DRAINAGE DITCH SECTION

BEDDING TYPES FOR R.C.P. PIPES

WINGED HEADWALL

SINGLE CURB INLET

EXTRUDED CONCRETE CURB

NOT TO SCALE

WINGED HEADWALL
W/ ENERGY DISSIPATERS

Case 3:16-cv-03309 Document 1 Filed 12/28/16 Page 30 of 86 PageID #: 33





DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION No.
SITE PLAN DETAILS



| REVISIONS: | | |
|---|---|---|
| 2 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 |
| 3 | REVISED PER T.O.T.S. PLANNING COM. | 10-22-13 |
| 4 | REVISED PER T.O.T.S. | 06-16-14 |





DETAIL OF INLET SEDIMENT CONTROL DEVICE WITH CURB DEFLECTOR

ROCK FILTER

SECTION A—A

PEDESTRIAN CROSSWALK

SILT FENCE BELOW A STEEP OR LONG GRADE

SILT FENCE

CHANNEL INSTALLATION

JOINING SILT FENCE SECTIONS

OUTLET PROTECTION

STONE CONSTRUCTION EXIT

TURF REINFORCEMENT MATTING

SECTION A—A

Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 31 of 86 PageID #: 34




DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 16
SITE PLAN DETAILS

REVISIONS

| | | | |
|---|---|---|---|
| 2 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 | |
| 3 | REVISED PER T.O.T.S. PLANNING COM. | 10-22-13 | |
| 4 | REVISED PER T.O.T.S. | 06-16-14 | |
| 5 | REVISED PER T.O.T.S. | 06-25-14 | |




SHEET C1.1.1



Case 3:16-cv-03809   Document 1-10   Filed 12/28/16   Page 32 of 86 PageID #: 35

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION I

EPSC PLAN  PHASE I



Case 3:16-cv-03509   Document 1   Filed 12/28/16   Page 33 of 86 PageID #: 36

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
EPSC PLAN   PHASE 2



Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 34 of 86 PageID #: 37

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
EPSC PLAN PHASE 3



SEDIMENT POND 2

SECTION 1-A DEVELOPMENT
PLANS WHISTLE STOP
1565 THOMPSON STATION ROAD
WILLIAMSON COUNTY, TN 37179
EPSC PLAN DETAILS

C1.5



SEDIMENT POND 1

SECTION 1-A DEVELOPMENT
PLANS WHISTLE STOP
1565 THOMPSON STATION ROAD
EPSC PLAN DETAILS

Case 3:16-cv-03309   Document 9-1   Filed 12/28/16   Page 36 of 86 PageID #: 39



Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 37 of 86 PageID #: 40

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
DRAINAGE AREAS PLAN



Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 38 of 86 PageID #: 41



Case 3:16-cv-03309 Document 1-1 Filed 12/28/16 Page 39 of 86 PageID #: 42

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1
BRAKEMAN WAY - PLAN & PROFILE

TNR 148927



Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 40 of 86 PageID #: 43

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
BURGIN LANE PLAN & PROFILE



Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 41 of 86 PageID #: 44





Elevation

FLAGSTAFF LANE
LOCAL STREET - 46' ROW
V=25MPH




DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
FLAGSTAFF LANE PROFILE PLAN

TNR 148927




| REVISIONS | | |
|---|---|---|
| 2 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 |
| 3 | REVISED PER T.O.T.S. PLANNING COM. | 10-22-13 |
| 4 | REVISED PER T.O.T.S. | 08-18-14 |
| 5 | REVISED PER T.O.T.S. | 09-25-14 |



Case 3:16-cv-03309   Document 9-1  Filed 12/28/16   Page 43 of 86 PageID #: 46

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1
STORM WATER MANAGMENT PLAN



Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 44 of 86 PageID #: 47

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
WATER QUALITY SWALE PLAN & PROFILE



Case 3:16-cv-03309   Document 1   Filed 12/28/16   Page 45 of 86 PageID #: 48

**LEGEND**

SILT FENCE

STONE CHECK DAM

— — — — EXISTING CONTOUR

———————— PROPOSED CONTOUR

LOT NUMBER

EXISTING TREE TO BE REMOVED

DRAINAGE FLOW PATH

WS = WATER SERVICE
SL = SEWER SERVICE LINE

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
UTILITY PLAN

**REVISIONS:**

| 2 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 |
| 3 | REVISED PER T.O.T.S PLANNING COM. | 10-22-13 |
| 4 | REVISED PER T.O.T.S. | 09-16-14 |
| 5 | REVISED PER T.O.T.S. | 09-25-14 |

TNR 148927



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD

UTILITY DETAILS



Case 3:16-cv-08309   Document 1   Filed 12/28/16   Page 47 of 86 PageID #: 50



SANITARY SEWER LINE 3 PROFILE PLAN

SCALE:
HORIZONTAL 1"=50.00'
VERTICAL 1"=5.00'



SANITARY SEWER LINE 3



NOTES:
1. THE LOCATION OF THRUST BLOCK EXTEND ON DIRECTION OF THRUST AS SHOWN.

2. INSTALL THRUST BLOCKS AGAINST FIRM UNDISTURBED EARTH. IF AT LEAST 2000 P.S.I. COMPRESSIVE STRENGTH IN 28 DAYS.

3. THRUST LOCATION TO BE INSTALLED NEXT TO FITTING. 2"x2" MINIMUM CONCRETE FOR 4" AND 6" PIPE, AND 6" OF MINIMUM CONCRETE FOR ALL LARGER PIPES.

4. SCALE DOWN SPRAY BLOCK AGAINST AREA FOR PVC IN SANDY SOIL (200 P.S.I. WATER PRESSURE) FOR CUT OUT DURING THE INSIDE.

SHEET CS.2

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
SANITARY SEWER LINES PROFILE PLAN

REVISIONS:
| 2 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 |
| 3 | REVISED PER T.O.T.S. PLANNING COM. | 10-22-13 |
| 4 | REVISED PER T.O.T.S. | 06-16-14 |
| 5 | REVISED PER T.O.T.S. | 06-25-14 |



TNR 148927

Case 3:16-cv-08309    Document 1    Filed 12/28/16    Page 48 of 86 PageID #: 51



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A

Case 3:16-cv-03809   Document 1-1   Filed 12/28/16   Page 49 of 86 PageID #: 52

TNR 148927



SANITARY SEWER FORCE MAIN PROFILE PLAN
SCALE: 1"=50'0"

SANITARY SEWER FORCE MAIN SITE PLAN

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
SANITARY SEWER FORCE MAIN PROFILE PLAN

Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 50 of 86 PageID #: 53



Case 3:16-cv-03309   Document 1   Filed 12/28/16   Page 51 of 86 PageID #: 54



Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 52 of 86 PageID #: 55

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
PUMP STATION DETAILS

| REVISIONS: | | |
|---|---|---|
| 1 | DEVELOPMENT PLANS SUBMITTAL | 01-27-14 |
| 2 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 |
| 3 | REVISED PER T.O.T.S. PLANNING COM. | 10-22-13 |
| 4 | REVISED PER T.O.T.S. | 08-15-14 |

TNR 145827



Case 3:15-cv-00509  Document 1-4  Filed 12/28/16  Page 53 of 86 PageID #: 56







## SECTION 1A LANDSCAPE PLAN

Scale 1" = 50'

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION RD.
PRELIMINARY PLAT
SECTION 1A

146 N A 004.00
BROWN MAGGIE BETTY

146 N A 003.00
HAYNES ANNA L

146 N A 002.00
BROWN JANIE LOU

GAMBLE
DESIGN COLLABORATIVE

Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 54 of 86 PageID #: 57

# IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

WHISTLE STOP FARMS, LLC,                  )
                                      )
      Petitioner,                           )
                                        )
v.                                        )     Case No. _____
                                        )
THE BOARD OF MAYOR AND                    )
ALDERMEN for THOMPSON'S STATION,          )
TENNESSEE, acting on behalf of the        )
TOWN OF THOMPSON'S STATION,               )
TENNESSEE,                                )
                                        )
      Respondent.                           )

## NOTICE OF FILING

Comes now the Petitioner, Whistle Stop Farms, LLC, and given notice of filing The Preface, Ordinance Adoption, and Title 18 of The Thompson's Station Municipal Code.

Respectfully submitted,

HALE AND HALE, PLC

Douglas S. Hale, BPR #6669
Kathleen Hale McClellan, BPR #28724
231 Public Square, Suite 312
Franklin, Tennessee 37064
(615) 794-1312
(615) 790-9236-fax
kathleen@haleandhale.com
Counsel for Petitioner

# THE
# THOMPSON'S STATION
# MUNICIPAL
# CODE

Prepared by the



Municipal Technical Advisory Service
*In cooperation with the Tennessee Municipal League*

October 2009

# TOWN OF THOMPSON'S STATION, TENNESSEE

## MAYOR

Corey Napier

## ALDERMEN

Ron Barrett
Sarah Benson
Nina Cooper
Brinton Davis

## RECORDER

Leah Rainey

Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 57 of 86 PageID #: 60

# PREFACE

The Thompson's Station Municipal Code contains the codification and revision of the ordinances of the Town of Thompson's Station, Tennessee. By referring to the historical citation appearing at the end of each section, the user can determine the origin of each particular section. The absence of a historical citation means that the section was added by the codifier. The word "modified" in the historical citation indicates significant modification of the original ordinance.

The code is arranged into titles, chapters, and sections. Related matter is kept together, so far as possible, within the same title. Each section number is complete within itself, containing the title number, the chapter number, and the section of the chapter of which it is a part. Specifically, the first digit, followed by a hyphen, identifies the title number. The second digit identifies the chapter number, and the last two digits identify the section number. For example, title 2, chapter 1, section 6, is designated as section 2-106.

By utilizing the table of contents, code index and the analysis preceding each title and chapter of the code, together with the cross references and explanations included as footnotes, the user should locate all the provisions in the code relating to any question that might arise. However, the user should note that most of the administrative ordinances (e.g. Annual Budget, Zoning Map Amendments, Tax Assessments, etc...) do not appear in the code. Likewise, ordinances that have been passed since the last update of the code do not appear here. Therefore, the user should refer to the city's ordinance book or the city recorder for a comprehensive and up to date review of the city's ordinances.

Following this preface is an outline of the ordinance adoption procedures, if any, prescribed by the city's charter.

The code has been arranged and prepared in loose-leaf form to facilitate keeping it up to date. MTAS will provide updating service under the following conditions:

(1) That all ordinances relating to subjects treated in the code or which should be added to the code are adopted as amending, adding, or deleting specific chapters or sections of the code (see section 7 of the adopting ordinance).

(2) That one copy of every ordinance adopted by the city is kept in a separate ordinance book and forwarded to MTAS annually.

(3) That the city agrees to pay the annual update fee as provided in the MTAS codification service charges policy in effect at the time of the update.

Case 3:16-cv-03309   Document 1-1   Filed 12/28/16   Page 58 of 86 PageID #: 61

Change 1, March 11, 2014

When the foregoing conditions are met MTAS will reproduce replacement pages for the code to reflect the amendments and additions made by such ordinances. This service will be performed at least annually and more often if justified by the volume of amendments. Replacement pages will be supplied with detailed instructions for utilizing them so as again to make the code complete and up to date.

The able assistance of the codes team: Emily Keyser, Program Resource Specialist; and Linda Winstead, Nancy Gibson, and Doug Brown, Administrative Specialists, is gratefully acknowledged.

Melissa Ashburn
Codification Consultant

iv

## ORDINANCE ADOPTION PROCEDURES PRESCRIBED BY THE TOWN CHARTER

1.  An ordinance shall be considered and adopted on two (2) separate days; any other form of board action shall be considered and adopted on one (1) day. Any form of board action shall be passed by a majority of the members present, if there is a quorum. A quorum is a majority of the members to which the board is entitled. All ayes and nays on all votes on all forms of board action shall be recorded. (6-2-102)

2.  Each ordinance, or the caption of each ordinance, shall be published after its final passage in a newspaper of general circulation in the municipality. No ordinance shall take effect until the ordinance or its caption is published. (6-2-101)

v

## ORDINANCE NO. 09- 074

AN ORDINANCE ADOPTING AND ENACTING A CODIFICATION AND REVISION OF THE ORDINANCES OF THE TOWN OF THOMPSON'S STATION, TENNESSEE.

WHEREAS some of the ordinances of the Town of Thompson's Station are obsolete, and

WHEREAS some of the other ordinances of the town are inconsistent with each other or are otherwise inadequate, and

WHEREAS the Board of Mayor and Aldermen of the Town of Thompson's Station, Tennessee, has caused its ordinances of a general, continuing, and permanent application or of a penal nature to be codified and revised and the same are embodied in a code of ordinances known as the "Town of Thompson's Station Municipal Code," now, therefore:

BE IT ORDAINED BY THE BOARD OF MAYOR AND ALDERMEN OF THE TOWN OF THOMPSON'S STATION, TENNESSEE, THAT:

Section 1. Ordinances codified. The ordinances of the town of a general, continuing, and permanent application or of a penal nature, as codified and revised in the following "titles," namely "titles" 1 to 20, both inclusive, are ordained and adopted as the "Town of Thompson's Station Municipal Code," hereinafter referred to as the "municipal code."

Section 2. Ordinances repealed. All ordinances of a general, continuing, and permanent application or of a penal nature not contained in the municipal code are hereby repealed from and after the effective date of said code, except as hereinafter provided in Section 3 below.

Section 3. Ordinances saved from repeal. The repeal provided for in Section 2 of this ordinance shall not affect: Any offense or act committed or done, or any penalty or forfeiture incurred, or any contract or right established or accruing before the effective date of the municipal code; any ordinance or resolution promising or requiring the payment of money by or to the town or authorizing the issuance of any bonds or other evidence of said town's indebtedness; any appropriation ordinance or ordinance providing for the levy of taxes or any budget ordinance; any contract or obligation assumed by or in favor of said town; any ordinance establishing a social security system or providing coverage under that system; any administrative ordinances or resolutions not in conflict or inconsistent with the provisions of such code; the

portion of any ordinance not in conflict with such code which regulates speed, direction of travel, passing, stopping, yielding, standing, or parking on any specifically named public street or way; any right or franchise granted by the town; any ordinance dedicating, naming, establishing, locating, relocating, opening, paving, widening, vacating, etc., any street or public way; any ordinance establishing and prescribing the grade of any street; any ordinance providing for local improvements and special assessments therefor; any ordinance dedicating or accepting any plat or subdivision; any prosecution, suit, or other proceeding pending or any judgment rendered on or prior to the effective date of said code; any zoning ordinance or amendment thereto or amendment to the zoning map; nor shall such repeal affect any ordinance annexing territory to the town.

Section 4. __Continuation of existing provisions.__ Insofar as the provisions of the municipal code are the same as those of ordinances existing and in force on its effective date, said provisions shall be considered to be continuations thereof and not as new enactments.

Section 5. __Penalty clause.__ Unless otherwise specified in a title, chapter or section of the municipal code, including the codes and ordinances adopted by reference, whenever in the municipal code any act is prohibited or is made or declared to be a civil offense, or whenever in the municipal code the doing of any act is required or the failure to do any act is declared to be a civil offense, the violation of any such provision of the municipal code shall be punished by a civil penalty of not more than fifty dollars ($50.00) and costs for each separate violation; provided, however, that the imposition of a civil penalty under the provisions of this municipal code shall not prevent the revocation of any permit or license or the taking of other punitive or remedial action where called for or permitted under the provisions of the municipal code or other applicable law. In any place in the municipal code the term "it shall be a misdemeanor" or "it shall be an offense" or "it shall be unlawful" or similar terms appears in the context of a penalty provision of this municipal code, it shall mean "it shall be a civil offense." Anytime the word "fine" or similar term appears in the context of a penalty provision of this municipal code, it shall mean "a civil penalty."[1]

Each day any violation of the municipal code continues shall constitute a separate civil offense.

---

[1]State law reference
   For authority to allow deferred payment of fines, or payment by installments, see __Tennessee Code Annotated__, § 40-24-101 et seq.

Section 6. Severability clause. Each section, subsection, paragraph, sentence, and clause of the municipal code, including the codes and ordinances adopted by reference, is hereby declared to be separable and severable. The invalidity of any section, subsection, paragraph, sentence, or clause in the municipal code shall not affect the validity of any other portion of said code, and only any portion declared to be invalid by a court of competent jurisdiction shall be deleted therefrom.

Section 7. Reproduction and amendment of code. The municipal code shall be reproduced in loose-leaf form. The board of mayor and aldermen, by motion or resolution, shall fix, and change from time to time as considered necessary, the prices to be charged for copies of the municipal code and revisions thereto. After adoption of the municipal code, each ordinance affecting the code shall be adopted as amending, adding, or deleting, by numbers, specific chapters or sections of said code. Periodically thereafter all affected pages of the municipal code shall be revised to reflect such amended, added, or deleted material and shall be distributed to town officers and employees having copies of said code and to other persons who have requested and paid for current revisions. Notes shall be inserted at the end of amended or new sections, referring to the numbers of ordinances making the amendments or adding the new provisions, and such references shall be cumulative if a section is amended more than once in order that the current copy of the municipal code will contain references to all ordinances responsible for current provisions. One copy of the municipal code as originally adopted and one copy of each amending ordinance thereafter adopted shall be furnished to the Municipal Technical Advisory Service immediately upon final passage and adoption.

Section 8. Construction of conflicting provisions. Where any provision of the municipal code is in conflict with any other provision in said code, the provision which establishes the higher standard for the promotion and protection of the public health, safety, and welfare shall prevail.

Section 9. Code available for public use. A copy of the municipal code shall be kept available in the recorder's office for public use and inspection at all reasonable times.

Section 10. Date of effect. This ordinance shall take effect from and after its final passage, the public welfare requiring it, and the municipal code, including all the codes and ordinances therein adopted by reference, shall be effective on and after that date.

Passed 1st reading, _August 11_ , 2009.
Passed 2nd reading, _January 12_ , 2010.

_____
Vice Mayor

_____
Recorder

# TITLE 18

## WATER AND SEWERS[1]

**CHAPTER**
1. WASTEWATER RECLAMATION AND REUSE.
2. WASTEWATER SYSTEM USER RATES.

## CHAPTER 1

### WASTEWATER RECLAMATION AND REUSE

**SECTION**
18-101. Purpose.
18-102. Authority.
18-103. Jurisdiction.
18-104. Policy.
18-105. Development and cost responsibility.
18-106. Ownership.
18-107. Interpretation, conflict, and separability.
18-108. Saving provisions.
18-109. Definitions.
18-110. Requirements for proper wastewater discharge.
18-111. Maintenance of building sewers.
18-112. Sewer extensions.
18-113. User discharge requirements.
18-114. User charges.
18-115. Enforcement.
18-116. Conformance with subdivision regulations.
18-117. Concurrent TDEC approval.
18-118. Requirements for sketch plan.
18-119. Requirements for preliminary plan.
18-120. Requirements for final plat.
18-121. Requirements prior to construction.
18-122. Construction inspection.
18-123. Final inspection.
18-124. Acceptance by town.
18-125. Assurance for completion and operation of improvements: bonding requirements.

---

[1]Municipal code references
    Building and housing codes: title 12.

18-126. Easements and access.
18-127. Design criteria -- in general.
18-128. TDEC design criteria.
18-129. Reclamation and reuse system design.
18-130. Applicability.
18-131. Other requirements.
18-132. Requirements for drip emitter systems.
18-133. Collection system design criteria.
18-134. Grinder pump wastewater systems.

**18-101. Purpose.** Thompson's Station recognizes the need to manage wastewater that is generated within the town's service area, which is deemed to be the municipal corporate limits of the town. The reclamation and reuse of wastewater is identified as a viable means for providing public sewer service to new development(s) within the town and potentially to serve existing residences and businesses. Thompson's Station also recognizes that these wastewater reclamation and reuse systems must be properly designed, constructed, and financed to protect the public health, safety, and general welfare of the residents of the town.

This chapter sets forth the minimum standards for wastewater reclamation and reuse systems that will be located within the Thompson's Station service area. This chapter is not intended to replace the role of the Tennessee Department of Environment and Conservation, Division of Water Pollution Control. It sets forth some provisions that relate the reclamation and reuse systems within Thompson's Station to the unique environmental conditions and the development goals of the town. It is imperative that plans and designs comply with the Tennessee Department of Environment and Conservation's Design Criteria for Sewage Systems and the additional provisions that have been added to the Tennessee Design Criteria to include items not currently addressed in the Division of Water Pollution Control Standards. (These provisions are referenced in this chapter.)

**18-102. Authority.** The Town of Thompson's Station Board of Mayor and Aldermen is authorized to adopt by majority vote of the board, ordinances, including requirements for the posting of performance bonds and maintenance bonds, governing the operation and maintenance of nontraditional sewage systems (wastewater reclamation and reuse) that serve more than one (1) household. Such regulations shall be consistent with or more stringent than the Water Quality Control Act, compiled in <u>Tennessee Code Annotated</u>, title 69, chapter 3, part 1. Such regulations adopted pursuant to the Water Quality Control Act shall he approved in writing by the commissioner of environment and conservation. As used in this chapter, "nontraditional sewage disposal systems that serve more than one (1) household" does not include subsurface sewage disposal systems that are subject to the permitting requirements of

Tennessee Code Annotated, title 68, chapter 221, part 4 ("Subsurface Sewage Disposal Systems") or to wastewater treatment facilities owned or operated by a governmental entity or public utility. Such authority is expressly granted in Tennessee Code Annotated, § 68-221-607(16) (1999).

Pursuant to Tennessee Code Annotated, § 7-35-401, et seq., the mayor and board of aldermen, the governing body of the municipality, shall serve and perform as the authorized board of the town's wastewater works systems and facilities. Said mayor and board of aldermen are empowered and shall control the supervision of construction and operation of such works systems within the town, all in conformity with Tennessee Code Annotated, § 7-35-406. (Ord. #04-003, April 2004, as amended by Ord. #05-012, August 2005)

**18-103. Jurisdiction.** This chapter shall govern all new developments within the Town of Thompson's Station's service areas.

No building permit or certificate of occupancy shall be issued for any parcel or plat of land which was created by subdivision after the effective date of, and not in conformity with the provisions of this chapter and the referenced State of Tennessee statutes or rules/regulations. (Ord. #04-003, April 2004)

**18-104. Policy.** It is intended that this chapter shall be consistent with and assist efforts to implement the provisions contained in the town's zoning ordinance, major thoroughfare plan, subdivision regulations, and the open space planning program. (Ord. #04-003, April 2004)

**18-105. Development and cost responsibility.** Following the procedures outlined herein, the developer shall be responsible for the planning, design, permitting, and construction of all wastewater reclamation and reuse systems. The cost of planning, design, permitting, and construction of all wastewater reclamation and reuse systems shall be borne by the developer. (Ord. #04-003, April 2004)

**18-106. Ownership.** All of the components of the wastewater reclamation and reuse system, including the collection system, shall be dedicated, owned and operated by the Town of Thompson's Station or a designated agent. Conveyance shall be made to the town in fee simple, free, clear and unencumbered, by warranty or special warranty deed. The land area for the irrigation reuse shall be developed as multipurpose open space and be dedicated to the town so it may be integrated into a town-wide park system which would provide multiple benefits to the town, including the reuse of wastewater (no discharge of pollutants), detention of stormwater runoff (mitigation of non-point pollution) and recreation open space for the general welfare of the residents. (Ord. #04-003, April 2004)

**18-107. Interpretation, conflict and separability.** (1) In their interpretation and application, the provisions of this chapter shall be held to be the minimum requirements for promotion of the public health, safety and general welfare.

(2) It is established that this chapter is not intended to interfere with, abrogate or annul any regulations, statutes or laws. In any case where this chapter imposes restrictions different from those imposed by any other provision herein or another ordinance, or any other regulation, law or statute, whichever provision is more restrictive or imposes stricter standards shall control.

(3) If any part or provision of this chapter or application thereof is adjudged invalid by any court of competent jurisdiction, such judgment shall be confined in its operation to the part, provision or application directly involved in all controversy in which such judgment was rendered. The remainder of this chapter shall be considered valid and in full force and effect. (Ord. #04-003, April 2004)

**18-108. Saving provisions.** This chapter shall not he construed as altering, modifying, vacating or nullifying any action now pending or any rights or obligations obtained by any person, firm, or corporation by lawful action of Town of Thompson's Station and/or the Town of Thompson's Station prior to the adoption of this chapter. (Ord. #04-003, April 2004)

**18-109. Definitions.** For the purpose of this chapter, certain numbers, abbreviations, terms, and words used herein shall be used, interpreted, and defined as set forth in this section. Where words within this chapter have not been defined, the standard dictionary definition shall prevail.

Unless the context clearly indicates to the contrary, words used in the present tense include the future tense; and words in the plural include the singular.

(1) "Buffer zone." Minimum distance from the irrigation reuse area, or other portions of the treatment facilities or any system component as may be defined in other sections of this chapter to a property line, habitable structure, water well, right-of-way line, watercourse or other location as may be defined.

(2) "Building sewer." A sewer conveying wastewater from the premises of a user to the publicly owned sewer collection system.

(3) "Domestic wastewater." Wastewater having a quality typical to that generated in an average home with BOD, loading equal to or less than two hundred fifty (250) milligrams per liter (mg/l).

(4) "Easement." Authorization by a property owner for the use by another, and for a specified purpose, of any designated part of his property.

(5) "Effluent." The reclaimed water discharged from wastewater reclamation and reuse system applied to the irrigation reuse area(s).

(6) "Final plat." Plat map or plan of record of a subdivision and any accompanying material, as described in subdivision regulations.

(7)    "Irrigation area or irrigation reuse area." The land area on which reclaimed water is applied at properly controlled rates to enhance vegetation growth (agricultural, silvicultural, or aquacultural products).

(8)    "Lot." A parcel of land that:

(a)    Is undivided by any street or private road;

(b)    Is occupied by or designated to be developed for buildings or principal uses which must meet all zoning and subdivision requirements.

(c)    Contains the accessory buildings or uses customarily incidental to such building, use, or development, including such open spaces and yards as are designed and arranged or required by the zoning ordinance for such building, use, or development.

(9)    "Owner." The Town of Thompson's Station shall be the ultimate owner and operator of all wastewater reclamation and reuse systems and all of the components, including the necessary land and collection system.

(10)    "Planning commission." The municipal planning commission for the Town of Thompson's Station which has duly adopted subdivision regulations.

(11)    "Preliminary plat."    The preliminary drawing or drawings, described in the town's subdivision regulations, indicating the manner or layout of the subdivision to be submitted to the planning commission for approval.

(12)    "Pretreatment." The reduction of the amount of pollutants, the elimination of pollutants, or the alteration of the nature of pollutant properties in wastewater to a less harmful state prior to or in lieu of discharging or otherwise introducing such pollutants into a publicly owned sewer. The reduction or alteration can be obtained by physical, chemical, biological processes, or process changes or other means, except through dilution.

(13)    "Sketch plan."    A generalized concept plan of subdivision presenting information, as described in the town's subdivision regulations, in regard to proposed improvements and natural features of the property in question prepared prior to preliminary plat to save time and expense in reaching general agreement as to the form of the plat and the objectives of this chapter.

(14)    "Slope." The deviation of the land surface from the horizontal per unit horizontal distance changed, generally expressed in percent, i.e., vertical rise or fall per foot dividing the horizontal distance between contour lines into the vertical interval of the contours as required by the appropriate regulations.

(15)    "State." The State of Tennessee.

(16)    "State of Tennessee operating permit." Permit issued by TDEC granting approval and authority for the operation of a wastewater reclamation and reuse system within the State of Tennessee.

(17)    "Subdivision regulations." The documents entitled "Subdivision Regulations of the Town of Thompson's Station, Tennessee," latest revision.

(18)    "Tennessee Department of Environment and Conservation (TDEC)." Tennessee governmental agency responsible for regulatory compliance

with environmental regulations, formerly, the Tennessee Department of Health and Environment (TDHE). TDEC and TDHE may be used interchangeably.

(19)   "Town." Town of Thompson's Station, Tennessee, a municipal corporation governed by its mayor and board of aldermen. May also include the superintendent of wastewater facilities for the town or designated agent. Any reference herein to "city" shall mean town.

(20)   "Town's reclamation system operator." Including, but not limited to, the town or the private firm or a utility selected by the town to supervise the operation of the wastewater reclamation and reuse systems, and collection system, and who is charged with certain duties and responsibilities by this chapter, or his duly authorized representative. Operator being duly certified under applicable law or regulation.

(21)   "User." Any property owner and/or person who contributes, causes or permits the contribution of wastewater into the town's POTW.

(22)   "Utility." Any construction of public roads, public water, public drainage, public sanitary facilities, or any other improvement that is or will be dedicated to public use.

(23)   "Wastewater treatment system." A system used to collect, reclaim, store, filter, disinfect, and reuse purified wastewater. (Ord. #04-003, April 2004)

**18-110.   Requirements for proper wastewater discharge**. (1) It shall be unlawful for any person to place, deposit, or permit to be deposited in any unsanitary manner on public or private property within the service area of the town, any human or animal excrement, garbage, or other objectionable waste.

(2)   It shall be unlawful to discharge to any waters of the state within the service area of the town any sewage or other polluted waters, except where suitable treatment has been provided in accordance with provisions of this chapter and this section.

(3)   Except as herein provided, it shall be unlawful to construct or maintain any privy, privy vault, septic tank, cesspool. or other facility intended or used for the disposal of sewage.

(4)   The owner of all houses, buildings, or properties used for human occupancy, employment, recreation, or other purposes situated within the service area in which there is now located or may in the future be located a public sanitary sewer, is hereby required at is expense to install suitable toilet facilities therein, and to connect such facilities directly with the proper public sewer in accordance with the provisions of the chapter, within sixty (60) days after date of official notice to do so, provided that said property abuts upon a street or other public way containing a sanitary sewer. (Ord. #04-003, April 2004)

**18-111. Maintenance of building sewers**. Each individual property owner shall be entirely responsible for the construction, maintenance, repair or

replacement of the building sewer as deemed necessary to meet specifications of the town. Owners failing to maintain or repair building sewers or who allow storm water to enter the sanitary sewer may face enforcement action by the town, up to and including discontinuation of sewer service. (Ord. #04-003, April 2004)

**18-112. Sewer extensions**. All expansion or extension of the public sewer constructed by property owners or developers must follow policies and procedures developed by the town. In the absence of policies and procedures the expansion or extension of the public sewer must be approved in writing by the town. All plans and construction must follow the latest edition of Tennessee Design Criteria for Sewerage Works. Contractors must provide the superintendent or manager with documentation that all mandrel, pressure and vacuum tests as specified in design criteria were acceptable prior to use of the lines. Contractor's one (1) year warranty period begins with occupancy or first permanent use of the lines. Contractors are responsible for all maintenance and repairs during the warranty period and final inspections as specified by the superintendent or manager. The manager must give written approval to the contractor to acknowledge transfer of ownership to the town. Failure to construct or repair lines to acceptable standards could result in denial or discontinuation of sewer service. (Ord. #04-003, April 2004)

**18-113. User discharge requirements**. (1) General discharge prohibitions. No user shall contribute or cause to be contributed, directly or indirectly, any pollutant or wastewater which will pass through or interfere with the operation and performance of the wastewater reclamation and reuse system or any other wastewater system approved by the town. Violations of the general and specific prohibitions of this chapter may result in discontinuance of sewer service and other fines.

(2)    A user may not discharge the following into the public sewer system:

(a)    Any liquids, solids, or gases which by reason of their nature or quantity are, or may be, sufficient either alone or by interaction with other substances to cause fire or explosion, or be injurious or interfere in any other way to the wastewater reclamation and reuse system or to its operation.

At no time, shall two successive readings on an explosion hazard meter, at the point of discharge into the system (or at any point in the system) be more than five percent (5%) nor any single reading over twenty percent (20%) of the lower explosive limit (LEL) of the meter. Prohibited flammable materials including, but not limited to, waste streams with a closed cap flash point of less than one hundred forty degrees Fahrenheit (140° F) or sixty degrees Celsius (60° C) using the test methods specified in 40 CFR 261.21. Prohibited materials include, but are

not limited to, gasoline, kerosene, naphtha, benzene, toluene, xylene, ethers, alcohols, ketones, aldehydes, peroxides, chlorates, perchlorates, bromate, carbides, hydrides and sulfides and any other substances which the town, the state or EPA has notified the user is a fire hazard or a hazard to the system.

(b) Any wastewater having a pH less than 5.5 or higher than 9.5 or wastewater having any other corrosive property capable of causing damage or hazard to structures, equipment, and/or personnel wastewater reclamation and reuse systems and collection system.

(c) Solid or viscous substances in which may cause obstruction to the flow in a sewer or other interference with the operation of the wastewater reclamation and reuse system, such as but not limited to: fats, oils, greases, gravel, ashes, bones. sand, mud, coal, straw, shavings, metal, glass, rags, feathers, tar, plastics, wood, unground garbage, whole blood, hair and fleshings, entrails, and paper dishes, cups, milk containers, etc., either whole or ground by garbage grinders.

(d) Pollutants which result in the presence of toxic gases, vapors, or fumes within the POTW in a quantity that may cause acute worker health and safety problems.

(e) Petroleum oil, nonbiodegradable cutting oil, or products of mineral oil origin in amounts that will cause interference or pass through.

(f) Any wastewater containing any toxic pollutants, chemical elements, or compounds in sufficient quantity, either singly or by interaction with other pollutants, to injure or interfere with any treatment process, constitute a hazard to humans or animals, creates a public nuisance.

(g) Trucked or hauled wastewater or residues except at discharge points designated by the town.

(h) Any substance that may cause the wastewater reclamation and reuse system reclaimed water unsuitable for reclamation and reuse.

(i) Any stormwater, surface water, groundwater, roof runoff, subsurface drainage, and all other unpolluted drainage shall be discharged to such sewers as are specifically designated as storm sewers, or to a natural outlet approved by the superintendent and the Tennessee Department of Environment and Conservation. Industrial cooling water or unpolluted process waters may be discharged to the wastewater reclamation and reuse system with the prior written approval of the town.

(3) _Grease traps and other interceptors_. Fat, oil, and grease (FOG), waste food, and sand interceptors may be required when, in the opinion of the town, they are necessary for the proper handling of liquid wastes containing fats, oils, and grease, flammable wastes, ground food waste, sand, soil, and solids, or other ingredients in excessive amount which impact the wastewater

collection system or the wastewater reclamation and reuse system. All interceptors shall be of a type and capacity approved by the superintendent, and shall be located as to be readily and easily accessible for cleaning and inspection.

The interceptors shall be cleaned on a regular basis to prevent impact upon the wastewater collection and treatment system. Owners whose interceptors are deemed to be ineffective by the superintendent may be asked to change the cleaning frequency or to increase the size of the interceptors. Owners or operators of washing facilities will prevent the inflow of rainwater into the sanitary sewers.

The interceptors must be designed in accordance with Tennessee Department of Environment and Conservation engineering standards. Underground equipment shall be tightly sealed to prevent inflow of rainwater and easily accessible to allow regular maintenance. Control equipment shall be maintained by the owner or operator of the facility so as to prevent a stoppage of the collection system. If the town is required to clean out the public sewer lines as a result of a stoppage resulting from poorly maintained control equipment, the property owner shall be required to refund the labor, equipment, materials and overhead costs to the town. Nothing in this subsection shall be construed to prohibit or restrict any other remedy the town has under this chapter, or state or federal law. The town retains the right to inspect and approve installation of control equipment.

(4)  _Right to establish more restrictive criteria_. No statement in this section is intended or may be construed to prohibit the town from establishing specific wastewater discharge criteria more restrictive where wastes are determined to be harmful or destructive to the facilities or to create a public nuisance, or to cause the discharge of the wastewater reclamation and reuse system to be unsuitable for reuse at the minimum buffer standards.

(5)  _Enforcement response plan_.  (a) Whenever the town or superintendent has reason to believe that a violation of any provision of the discharge regulations is occurring, or is about to occur, suit may be filed in the chancery or circuit court requesting injunctive relief, civil penalties and recovery of damages which have occurred.

(i)  Damages include: damage or destruction of physical facilities, disruption of operation of facilities due to the discharge of prohibited substances, damage or disruption of treatment processes, clean up costs and expenses associated with returning facilities and processes to normal operations, injury to personnel, attorneys' fees and other expenses borne by the town because of a prohibited discharge.

(ii)  Emergency action. (A) Whenever the superintendent finds that an emergency exists requiring immediate action to protect the public health, safety or welfare, the health of animals, fish or aquatic life, a public water supply, or the facilities of the POTW, the superintendent may, without

prior notice, issue an order reciting the existence of such an emergency and requiring that any action be taken as the superintendent deems necessary to meet the emergency.

(B)    If the violator fails to respond or is unable to respond to the order, the superintendent may take any emergency action as he deems necessary, or contract with a qualified person or persons to carry out the emergency measures. The superintendent may assess the person or persons responsible for the emergency condition for the actual costs incurred by the town in meeting the emergency,

(C)    If emergency action is taken, suit will be filed according to the provisions of (A) against the violator for damages and other relief. (Ord. #04-003, April 2004)

**18-114.  User charges**.  The town will implement by ordinance user charges to establish rates so as to have a self-sustaining enterprise fund for the operation, maintenance, administration, depreciation and other attributable costs. This chapter for wastewater reclamation and reuse systems shall further be subject to future amendment so as to establish fees and charges, which may include inspection and installation fees, fees for application of discharge, surcharge fee and any other fees and charges as the town may hereafter establish. User charges for the use of the wastewater systems and services supplied by the wastewater system by the town will be reviewed not less than annually. Further, by separate ordinance, the town may adopt billing and collection procedures and resolutions to implement the same. (Ord. #04-003, April 2004)

**18-115.  Enforcement**.  Violation of this chapter shall be enforceable in law and equity, including, but not limited to, injunctive relief in the chancery court for Williamson County, Tennessee. Violation of this chapter may also result in the issuance of a citation and violators shall be subject to a fifty dollar ($50.00) civil penalty. Each separate day of violation shall constitute a separate offense. Violation hereof may also constitute a separate state offense punishable under applicable law. (Ord. #04-003, April 2004)

**18-116.  Conformance with subdivision regulations**.  It is the intention of the town and its municipal planning commission that the procedures for submittal and review of wastewater reclamation and reuse systems conform to the general and specific procedures presented in the subdivision regulations. (Ord. #04-003, April 2004)

**18-117.  Concurrent TDEC approval**.  Review and approval of wastewater reclamation and reuse system will be required from both the TDEC and the town. It is anticipated that this review and approval process will be

accomplished on a concurrent basis. However, planning staff or designated agents shall not approve any wastewater reclamation and reuse system or the final plat of the development that they shall serve, until such time as the Tennessee Department of Environment and Conservation has completed their review and issued an approval to construct the system. (Ord. #04-003, April 2004)

**18-118. <u>Requirements for sketch plan</u>**. The sketch plan submitted to the municipal planning commission for approval shall contain a feasibility assessment of the reclamation and reuse system. The general intent of the feasibility assessment shall be to confirm how the wastewater reclamation and reuse concept desired by the town will be met on the proposed site. The work will include identification of sites and initial sizing of the reclamation system and irrigation system, initial soils identification, and the beginning of the TDEC review process.

Required components of the wastewater reclamation and reuse feasibility assessment:

(1)    Identification of site development and land and constraints;

(2)    Number and type of homes and/or buildings;

(3)    Site development and/or land use plan;

(4)    Initial parameters for the wastewater reclamation and reuse system including flow rates, wastewater quality, special considerations;

(5)    How the wastewater reclamation and reuse system fits into the site and town's development plan including meeting standards for green space and other environmental goals;

(6)    Permitting process and any special considerations;

(7)    Wastewater flow: in gallons/day (GPD);

(8)    Land area estimates and proposed site locations for the treatment and irrigation areas and preliminary sizing of these units;

(9)    Preliminary construction cost;

(10)    Preliminary annual operation and maintenance cost;

(11)    Topographic surveys and mapping (if available);

(12)    Soil borings and/or hydrogeologic information (related to construction activity), if available;

(13)    Location of any on-site utilities.

If a developer proposes to use wastewater treatment processes other than the deep cell lagoon reclamation system desired by the town, the developer will prepare a detailed written explanation containing both technical, and capital and operating cost evaluations justifying its use because of economic hardship. This justification will be prepared and submitted along with the feasibility assessment. (Ord. #04-003, April 2004, modified)

**18-119. <u>Requirements for preliminary plat</u>**. The preliminary plat submitted to the planning commission for its approval shall contain an

engineering report that is consistent with the engineering report guidelines outlined in the State of Tennessee Department of Environmental Conservation, Division of Water Pollution Control, Design Criteria for Sewage Works, latest edition. The engineering report shall be submitted to TDEC before the preliminary plat is approved. (Ord. #04-003, April 2004)

**18-120. Requirements for final plat.** The final plat submitted to the planning commission for its approval shall contain detailed construction plans and specifications for the wastewater reclamation and reuse system. The construction plans and specifications shall be consistent with final engineering plans and specifications outlined in the State of Tennessee Department of Environmental Conservation, Division of Water Pollution Control, Design Criteria for Sewage Works, latest edition.

Prior to approval of the final plat, the developer shall obtain an approved state operating permit and construction permit for the wastewater reclamation and reuse system from TDEC. (Ord. #04-003, April 2004)

**18-121. Requirements prior to construction.** The detailed plans and specifications for the wastewater reclamation and reuse system shall be submitted to and approved by TDEC and a construction permit secured before construction can be initiated in the development. (Ord. #04-003, April 2004)

**18-122. Construction inspection.** The town shall require that frequent, comprehensive, and sound inspections occur during construction. The developer shall ensure that competent and experienced personnel, preferably the design engineer or his representative, carefully monitor the progress of construction, and the town will inspect for compliance that all work essentially conforms to the approved plans and specifications. The developer or his representative shall maintain records of inspection activities, and, based on those records, certify that the project has been constructed as designed and approved. (Ord. #04-003, April 2004)

**18-123. Final inspection.** Upon completion of construction and testing as the town may in its discretion require, there shall be a final inspection and final approval by TDEC in accordance with the State of Tennessee Department of Environmental Conservation, Division of Water Pollution Control, Design Criteria for Sewage Works, latest edition. As-built plans shall be submitted simultaneously therewith, properly sealed. (Ord. #04-003, April 2004)

**18-124. Acceptance by town.** As described in this chapter, the wastewater reclamation and reuse system will be dedicated, owned, and operated by the Town of Thompson's Station. The construction of the wastewater reclamation and reuse system shall be completed and approved by TDEC, an operating permit must be issued by TDEC, the design engineer shall

submit certification that the system was constructed in accordance with approved construction plans and specifications, and TDEC will perform and approve the final inspection, prior to acceptance by the town and the issuance by the town's building official utilizing a system within a development and upon a lot being served under the terms of this chapter. (Ord. #04-003, April 2004, amended by Ord. #05-012, Aug. 2005)

**18-125. Assurance for completion and operation of improvements: bonding requirements**. A performance bond in the form of an irrevocable stand-by letter of credit will be required for all projects utilizing a wastewater reclamation and reuse system. The bond shall be in an amount as determined by the town's consultant(s) as deemed to be sufficient to secure and assure the town the satisfactory construction, installation and dedication of uncompleted required improvements, including all necessary off-site improvements. Upon completion of the required improvements, the performance bond may be reduced to a maintenance bond of not less than thirty percent (30%) of the performance amount. The requisite maintenance bond shall remain in place until the system is accepted by the town. (Ord. #05-012, Aug. 2005)

**18-126. Easements and access**. All required wastewater utility easements shall be shown on plat or site plan. Easements shall be provided to allow access and to perform future maintenance by the town or its agents to all components of the wastewater collection, reclamation, and reuse systems. (Ord. #04-003, April 2004)

**18-127. Design criteria – in general**. This section establishes technical criteria to be used in the design of all wastewater reclamation and reuse systems in Thompson's Station. The criteria are based upon established TDEC and U.S. EPA design criteria. These criteria may be modified to accommodate site specific conditions and changes in TDEC requirements.

The criteria do not apply to single residential or non-residential lots utilizing septic tanks for their treatment and disposal of wastewater, which shall be designed and constructed in accordance with Tennessee Department of Environment and Conservation Rules, Chapter 1200-1-6, entitled "Regulations to Govern Subsurface Sewage Disposal Systems." (Ord. #04-003, April 2004)

**18-128. TDEC design criteria**. The Tennessee Department of Environmental Conservation has issued criteria for the design and construction of wastewater facilities, including components of the reclamation and reuse systems. The latest revisions of these criteria, entitled "Design Criteria for Sewage Works," are hereby incorporated by reference into this chapter. Individual items in the TDEC design criteria may be modified as described in specific sections herein to conform to the requirements of Thompson's Station. (Ord. #04-003, April 2004)

**18-129. <u>Reclamation and reuse system design</u>.** The treatment system of choice for Thompson's Station is a deep cell, long duration reclamation cell followed by reuse of high quality effluent through irrigation of green space. Except as noted, design criteria for the reclamation cells should follow TDEC's Design Criteria, Section 9, entitled "Ponds and Aerated Lagoons." Except as noted, design criteria for the irrigation system, whether surface spray irrigation or subsurface drip irrigation, should follow TDEC's Design Criteria, Section 16, entitled "Slow Rate Land Treatment" or other design criteria accepted by TDEC. Additional requirements for subsurface drip emitter systems are presented in subsequent paragraphs of this section.

The town will allow use of alternative wastewater reclamation and reuse systems on a case-by-case, hardship, basis. Design criteria for these systems shall follow the appropriate section of the TDEC design criteria. (Ord. #04-003, April 2004)

**18-130. <u>Applicability</u>.** This chapter applies to all wastewater management systems developed in Thompson's Station.

The town has selected deep cell, long duration aerated lagoon treatment followed by irrigation as its wastewater reclamation and reuse system of choice. Use of systems other than the above will not be prohibited, but will be considered when a developer shows that the use of the system of choice will cause an economic hardship. If a developer proposes to use other wastewater treatment processes, they shall prepare a detailed written explanation containing both technical, and capital and operating cost evaluations justifying its use. Final approval of all systems shall lie with the mayor and board of aldermen of the town.

This chapter will not apply to point discharge systems which operate through the National Pollution Discharge Elimination System (NPDES) or septic systems utilizing land disposal to serve single residential lots, or non-residential lots with flows less than one thousand five hundred (1,500) gallons per day (GPD). (Ord. #04-003, April 2004)

**18-131. <u>Other requirements</u>.** (1) Wastewater treatment or reclamation systems covered by this chapter that require septic tanks as part of the treatment process will require septic tanks be pumped on a regular basis. As a minimum, septic tanks shall be pumped out at least every three (3) years. If required for proper operation, the septic tanks must be pumped more frequently. In addition, sealed septic tanks that are part of systems regulated by this chapter will have leak testing performed every three (3) years. All such septic tanks will be water tight, and a minimum of one thousand (1,000) gallons capacity, or larger, as determined by the town's review process.

(2) Section 16.1.3 of chapter 16 of the TDEC design criteria is revised as follows: The irrigation sites shall be located above the ten (10) year flood plain elevation and shall not be utilized when covered by flood waters. The

wastewater treatment system shall be located outside or above the one hundred (100) year flood plain elevation.

(3)     Section 16.9.3, buffer zone requirements, of chapter 16 of the TDEC design criteria shall have the following paragraphs added:

Width of buffer zones shall be determined based upon the quality of the reclaimed water. Reclaimed water that contains 2.4 fecal coliforms per 100 ml and a turbidity level 3 NTU does not require any buffer zone, other than as may be specified in the town's zoning ordinance.

The quality of the reclaimed water that will be reused on public areas will be reviewed by the TDEC and Town of Thompson's Station on a case-by-case basis. Irrigation will be scheduled when the public areas are "closed" so that the application does not interfere with usage. When a wastewater reclamation and reuse system is designed and operated, the following issues should be considered:

(1)     The system operator discontinues irrigation pumping of effluent to the site in the event of an obvious plant upset.

(2)     When the reuse water falls below 2.4 fecal coliforms per one hundred (100) ml and turbidity exceeds three (3) NTUs, irrigation is interrupted until the reuse water quality is within compliance.

(3)     All reuse water valves or outlets will be appropriately tagged to warn the public that the water is not to be used for drinking or bathing.

(4)     All piping, valves, and outlets will be marked to differentiate reuse water from domestic or other potable water. A different pipe material can be used to facilitate water system identification.

(5)     All reuse water valves, outlets, and sprinkler heads will be operated only by authorized personnel. Where hose bibs are present on domestic and effluent water lines, differential sizes will be established to preclude the interchange of hoses.

(6)     Adequate means of notification will be provided to inform the public that reuse water is being irrigated. At golf courses, notices will also be printed on score cards and at all water hazards containing effluent reuse water.

(7)     Application or use of reuse water will be done so as to prevent or minimize public contact with the reuse water and precautions shall be taken to ensure that the reuse water is not being sprayed on walkways, passing vehicles, buildings, picnic tables, domestic water facilities, or areas not under control of the user. Also:

(a)     Application of the reuse water should take place during periods when the grounds will have maximum opportunity to dry before use by the public unless provisions are made to exclude the public from areas during and after spraying with effluent water.

(b)     Windblown spray from the application of effluent water should not carry beyond the reuse irrigation area.

(c)     Reuse water will be kept separate from domestic water wells and reservoirs.

  (d) Drinking water fountains will be protected from direct or windblown reuse water spray.

  (8) Adequate measures will be taken to prevent the breeding of flies, mosquitoes, and other vectors of public health significance during the process of reuse irrigation.

  (9) Operation of reclamation and reuse systems shall not create odors. (Ord. #04-003, April 2004)

  **18-132. Requirements for drip emitter systems.** Chapter 16 of the Department of Environment and Conservation's Design Criteria does not address the use of drip emitter systems for the disposal of treated effluent.

  Wastewater reclamation and reuse systems utilizing subsurface drip emitters shall meet the reclaimed water quality standards established in chapter 16 of the TDEC's Design Criteria for Sewage Works. The town will review each application and may require more stringent treatment standards as it deems necessary.

  The following provisions shall apply for drip emitter systems:

  (1) Buffer zones, public access and protection of water supply wells. Buffer zones are required to provide adequate access to buried drip lines and to ensure that no wastewater leaves the site. The following minimum buffer zones must be provided for all systems:

   (a) A twenty-five-foot (25') buffer must be maintained between the edge of the subsurface piping and the property line. A minimum fifty-foot (50') buffer must be maintained between the edge of surface piping and the property line. This requirement is subject to change as a result of site topography and the flushing system provided.

   (b) A twenty-five foot (25') undisturbed natural vegetative buffer is required between the drip piping and the edge of any perennial lake, stream, or channelized intermittent watercourse. If application of wastewater causes a non-channelized intermittent watercourse to become perennial, a twenty-five foot (25') buffer requirement will apply. All buffer requirements for trout streams and sedimentation and erosion control will also apply.

   (c) Requirements for buffer areas in relation to potable water wells will be determined after reviewing groundwater pollution susceptibility and groundwater recharge maps or by contacting the Division of Water Supply, Tennessee Department of Environment and Conservation. In no case shall a wastewater application system be located within three hundred feet (300') of a drinking water well. Wellhead protection requirements may increase the buffer distances as necessary.

   (d) An operation plan that presents the procedures to assure that the drip emitter system remains functional public access to the emitter field shall be restricted by posting signs and fencing of disposal fields. Fencing and access road gates shall be provided along property

lines adjacent to residential and other developed areas. Fencing is required around all wastewater treatment systems, storage facilities, pump stations, and holding ponds.

(2) <u>Surface drainage and run-off control</u>. Drip emitter systems shall also include provisions to stop irrigation and hold wastewater for a minimum of ten (10) days for storage when soil conditions are wet or when flooding occurs. The wastewater storage requirements utilizing spray application disposal method shall be in accordance with chapter 16 of TDEC's design criteria for sewage works.

Storm run-off should be considered in the design of drip irrigation systems. If properly designed and constructed, drip emitter systems will not produce any runoff. All areas that acquire a wet surface should have the hydraulic loading rate reduced to prevent the situation from recurring. Areas exhibiting a wet surface on a regular basis must be eliminated from future applications unless the surface wetting can be corrected. A reassessment of the design should be performed to determine if reconstruction or repair of the failing area would correct the deficiency. Any areas taken out of service because of failure will subsequently cause a reduction in the permitted system capacity.

Indirect runoff as a result of underflow, changes in slope, and shallow restrictive soil layers can be anticipated at some drip emitter system sites. Indirect runoff will be reviewed on a case-by-case basis by the town.

Water resulting from line flushing must be dispersed over a wide area and will be reviewed on a case-by-case basis by the town. Direct discharge of these flows into any watercourse is prohibited. Effluent from line flushing should be absorbed by the surrounding area within a few minutes of line flushing. Line flushing should not be performed during any rain event.

(3) <u>Distribution systems, maintenance and construction</u>. Hydraulic calculations for the pump and distribution system must be submitted for review. Field pressure and flow variation due to friction loss and changes in static head should not exceed plus or minus ten percent (10%) of the design emitter pressure or flow. If this criterion cannot be met, revisions to field layout, emitter output, or any other viable option should be used to comply with this requirement. The system will not be allowed to initiate operations if the total flow or pressure variation is in excess of ten percent (10%) of the design. The ten percent (10%) difference should be the difference between any two (2) emitters in the entire system. Fields should be laid out so that the irrigation lines follow the contour of the site. Flushing flows and static head calculations can be addressed on a field-by-field basis. Each field should define total flow (gpm) proposed, total length of emitter piping, emitter spacing, line spacing, total numbering of lines and total number of lines to be included per flushing. This layout information should be shown on a topographic map. All proposed main line sizes and lengths along with individual irrigation line lengths should be shown. All return piping sizes and lengths should also be shown and should not exceed manufacturers' specifications to insure equal distribution to each

emitter. Emitter and line spacing should be in accordance with manufacturers' recommendations.

System should be self-draining to prevent freezing during the winter months. The plan of operation and management should address disinfection and flushing of emitter lines to prevent solids build-up. Flushing of lines should be performed according to the manufacturers' recommendations but at minimum on a bi-monthly basis. Velocities must be a minimum of two feet (2') per second at the end of each irrigation or return line during the flushing operation. Calculations supporting the two feet (2') per second velocity requirement should be included.

Satisfactory operation of the drip irrigation system is necessary to safeguard the health of the public and to insure that the wastewater effluent is disposed of in an environmentally sound manner. Emitter manufacturers must supply documentation that placing the emitter in the root zone of the cover crop will not interfere with the emitter performance. Emitters should be buried no less than five inches (5") nor more than seven inches (7") from the surface for optimum nutrient uptake. Variance from this depth of burial will be evaluated on a case-by-case basis if supported by manufacturers' recommendations. All systems must be equipped with audible and visual alarms to signal system malfunctions. Telemetry systems should also be installed where the facility is not manned during normal working hours. Monitoring equipment must be provided to detect a five percent (5%) change in flow rate to any given field. If a change is detected which shows a ten percent (10%) variance, evaluations must be performed to determine if it is a result of clogging filters, force main breaks, emitter clogging, leaks in field lines, a flush valve failure, etc. The plan of operation and management should address what actions are required to correct any such problem should it occur. Pumping equipment must be provided with pressure and flow sensitive controls which will disengage pumps if a main breaks or clogs.

Prior to pumping to the drip field distribution system, the wastewater must be screened to remove fibers, solids and other matter that might clog drip emitters. As a minimum, screens with a nominal diameter smaller than the smallest flow opening in the drip emitter tubing should be provided. Screening to remove solids greater than one-third (1/3) the diameter of the smallest drip emitter opening is recommended. (Ord. #04-003, April 2004, as amended by Ord. #05-012, Aug. 2005)

**18-133. <u>Collection system design criteria</u>.** (1) No person shall uncover, make any connections with or opening into, use, alter, or disturb any public sewer or appurtenance thereof. A connection fee shall be paid to the town at the time the application is filed.

(2) All costs and expenses incident to the installation, connection, and inspection of the building sewer shall be borne by the owner. The owner shall

indemnify the town from any loss or damage that may directly or indirectly be occasioned by the installation of the building sewer.

(3)     A separate and independent building sewer shall be provided for every building; except where one building stands at the rear of another on an interior lot and no private sewer is available or can be constructed to the rear building through an adjoining alley, court, yard, or driveway, the building sewer from the front building may be extended to the rear building and the whole considered as one building sewer.

(4)     Old building sewers may be used in connection with new buildings only when they are found on examination and tested by the superintendent to meet all requirements of this chapter. All others may be sealed to the specifications of the superintendent.

(5)     Building sewers shall conform to the following requirements:

(a)     The minimum size of a building sewer shall be as follows:
Conventional sewer system - Four inches (4").
Small diameter gravity sewer - Two inches (2").

(b)     The minimum depth of a building sewer shall be eighteen inches (18").

(c)     Building sewers shall be laid on the following grades:
Four-inch (4") sewers - One-eighth inch (1/8") per foot.
Two inch (2") sewers - Three-eighths inch (3/8") per foot.
Larger building sewers shall be laid on a grade that will produce a velocity when flowing full of at least two feet (2') per second.

(d)     Slope and alignment of all building sewers shall be neat and regular.

(e)     Building sewers shall be constructed only of ductile iron pipe class 50 or above or polyvinyl chloride pipe schedule 40 or and SDR-21 or greater. Joints shall be rubber or neoprene "0 " ring compression joints or solvent welded.

(f)     A cleanout shall be located five feet (5') outside of the building, one as it crosses the property line and one at each change of direction of the building sewer that is greater than forty-five degrees (45°). Additional cleanouts shall be placed not more than seventy-five feet (75') apart in horizontal building sewers of six inch (6") nominal diameter and not more than one hundred feet (100') apart for larger pipes. Cleanouts shall be extended to or above the finished grade level directly above the place where the cleanout is installed. A "Y" (wye) and one-eighth (1/8) bend shall be used for the cleanout base. Cleanouts shall not be smaller than four inches (4").

(g)     Connections of building sewers to the public sewer system shall be made only by the town and shall be made at the appropriate existing wyes or tee branch using compression type couplings or collar type rubber joint with stainless steel bands. Where existing wye or tee

branches are not available, connections of building services shall be made by either removing a length of pipe and replacing it with a wye or tee fitting using flexible neoprene adapters with stainless steel bands of a type approved by the superintendent. All such connections shall be made gastight and watertight.

(h)     The building sewer may be brought into the building below the basement floor when gravity flow from the building to the sanitary sewer is at a grade of one-eighth inch (1/8") per foot or more if possible. In cases where basement or floor levels are lower than the ground elevation at the point of connection to the sewer, adequate precautions by installation of check valves or other backflow prevention devices to protect against flooding shall be provided by the owner. In all buildings in which any building drain is too low to permit gravity flow to the public sewer sanitary sewage carried by such building drain shall be lifted by a step or grinder pump and discharged to the building sewer at the expense of the owner, pursuant to § 18-105.

(i)     The methods to be used in excavating, placing of pipe, jointing, testing, backfilling the trench, or other activities in the construction of a building sewer which have not been described above shall conform to the requirements of the building and plumbing code or other applicable rules and regulations of the town or to the procedures set forth in appropriate specifications of the ASTM and Water Environment Federation Manual of Practice FD-5. Any deviation from the prescribed procedures and materials must be approved by the superintendent before installation.

(j)     An installed building sewer shall be gastight and watertight.

(6)     All excavations for building sewer installation shall be adequately guarded with barricades and lights so as to protect the public from hazard. Streets, sidewalks, parkways, and other public property disturbed in the course of the work shall be restored in a manner satisfactory to the town.

(7)     No person shall make connection of roof downspouts, exterior foundation drains, areaway drains, basement drains, sump pumps, or other sources of surface runoff or groundwater to a building directly or indirectly to a public sanitary sewer.

(8)     Inspection of connections.     (a) The sewer connection and all building sewers from the building to the public sewer main line shall be inspected before the underground portion is covered, by the superintendent or his authorized representative.

(b)     The applicant for discharge shall notify the superintendent when the building sewer is ready for inspection and connection to the public sewer. The connection shall be made under the supervision of the superintendent or his representative.

(9)     Maintenance of building sewers. Each individual property owner shall be entirely responsible for the construction, maintenance, repair or

replacement of the building sewer as deemed necessary by the superintendent to meet specifications of the town. Owners failing to maintain or repair building sewers or who allow storm water to enter the sanitary sewer may face enforcement action by the superintendent up to and including discontinuation of service.

(10) <u>Sewer extensions</u>. All expansion or extension of the public sewer constructed by property owners or developers must follow policies and procedures developed by the town. In the absence of policies and procedures the expansion or extension of the public sewer must be approved in writing by the superintendent or manager of the wastewater collection system. All plans and construction must follow the latest edition of Tennessee Design Criteria for Sewerage Works. (Ord. #04-003, April 2004)

**18-134. <u>Grinder pump wastewater systems</u>.** (1) When connection of building sewers to the public sewer by gravity flow lines is impossible due to elevation differences or other encumbrances, Grinder Pump (GP) systems may be installed subject to the regulations of the town board.

(2) <u>Installation requirements</u>. Location of tanks, pumps, and effluent lines shall be subject to the approval of the town. Installation shall follow design criteria for STEP and OP systems as provided by the superintendent.

(3) <u>Costs</u>. GP equipment for new construction shall be purchased and installed at the developer's, homeowner's, or business owner's expense according to the specification of the town and connection will be made to the town sewer only after inspection and approval of the town.

(4) <u>Ownership and easements</u>. Homeowners or developers shall provide the town with ownership and an easement. Access by the town to the GP system must be guaranteed to operate, maintain, repair, restore and service. Access manholes, ports, and electrical disconnects must not be locked, obstructed or blocked by landscaping or construction.

(5) <u>Use GP systems</u>. Home or business owners shall follow the GP users guide provided by the system manufacturer and as supplemented by the town. Home or business owners shall provide an electrical connection that meets specifications and shall provide and pay for electrical power. Home or business owners shall be responsible for maintenance drain lines from the building to the GP tank.

(6) <u>Prohibited uses of the GP system</u>. (a) Connection of roof guttering, sump pumps or surface drains;

      (b)   Disposal of toxic household substances;

      (c)   Use of garbage grinders or disposers;

      (d)   Discharge of pet hair, lint, or home vacuum water;

      (e)   Discharge of fats, grease, and oil.

(7) <u>Additional charges</u>. The town shall be responsible for maintenance of the GP equipment. Repeat service calls for identical problems shall be billed

to the homeowner or business at a rate of no more than the actual cost of the service call.  (Ord. #04-003, April 2004)