# IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

WHISTLE STOP FARMS, LLC, )
)
    Petitioner, )
)
v. )    Case No. 43984
)
THE BOARD OF MAYOR AND )
ALDERMEN for THOMPSON'S STATION, )
TENNESSEE, acting on behalf of the )
TOWN OF THOMPSON'S STATION, )
TENNESSEE, )
)
    Respondent. )

## MOTION FOR LEAVE TO AMEND PETITION

Comes Petitioner, Whistle Stop Farms, LLC, by and through undersigned counsel, and respectfully moves this Court, pursuant to Tennessee Rule of Civil Procedure 15.01, for leave to amend its Petition for Writ of Certiorari and Supersedeas. A copy of Petitioner's proposed Amended Petition is attached hereto as **Exhibit 1**. Rule 15.01 provides that leave to amend pleadings shall be freely given when justice so requires. The Tennessee Supreme Court has emphasized the liberality by which trial courts shall approach a motion to amend pleadings, holding that "Rule 15 needs no construction. It means precisely what it says, that leave should be freely given." *Branch v. Warren*, 527 S.W.2d 89, 92 (Tenn. 1975) (noting that Rule 15.01 "substantially lessens the exercise of pre-trial discretion on the part of a trial judge" when ruling on a motion to amend). Furthermore, Tennessee trial courts have permitted a party seeking review of a decision via a writ of certiorari to amend their petition under Rule 15.01. *See Kiger v. Nixon*, No. 01A01-9511-CH-00501, 1996 Tenn. App. LEXIS 565 (Tenn. Ct. App. Sept. 11, 1996) (copy attached hereto as **Exhibit 2).**

**EXHIBIT 2**

Petitioner would show that the parties will not be prejudiced by this amendment, as this matter has been stayed for over a year. Finally, the parties will not be prejudiced by this amendment, as this matter is not set for hearing.

Accordingly, Petitioner respectfully requests an Order granting it leave to file its Amended Petition for Writ of Certiorari and Supersedeas, a copy of which is attached hereto as Exhibit 1.

Respectfully submitted,

Douglas S. Hale, BPR #6669
HALE AND HALE, PLC
231 Public Square, Suite 312
Franklin, Tennessee 37064
T: (615) 794-1312
P: (615) 790-9236
doug@haleandhale.com

*and*

Joshua R. Denton, BPR #23248
Thomas McFarland, BPR #33432
GULLETT, SANFORD, ROBINSON
& MARTIN, PLLC
150 Third Avenue South, Suite 1700
Nashville, Tennessee 37201
P: (615) 244-4994
F: (615) 256-6339
jdenton@gsrm.com
tmcfarland@gsrm.com

*Counsel for Petitioner Whistle Stop Farms, LLC*

## NOTICE OF HEARING

THIS MOTION IS SET TO BE HEARD BY THE HONORABLE MICHAEL W. BINKLEY IN THE WILLIAMSON COUNTY COURTHOUSE ON DECEMBER 15, 2016, AT 9:00 A.M. OR AS SOON THEREAFTER AS THE BUSINESS OF THE COURT WILL ALLOW. IF NO WRITTEN RESPONSE TO THIS MOTION IS FILED AND SERVED IN THE TIME SET BY THE LOCAL RULES OF PRACTICE, THIS MOTION MAY BE GRANTED WITHOUT A HEARING.

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2016, a true and exact copy of the foregoing has been served via U.S. Mail, postage prepaid, upon:

J. Todd Moore
1612 Westgate Circle, Suite #218
Brentwood, Tennessee 37207

*Counsel for the Respondent*

IN THE CHANCERY COURT FOR WILLIAMSON COUNTY, TENNESSEE

| | |
|---|---|
| WHISTLE STOP FARMS, LLC, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No. 43984 |
| | ) |
| THE BOARD OF MAYOR AND | ) |
| ALDERMEN for THOMPSON'S STATION, | ) |
| TENNESSEE, acting on behalf of the | ) |
| TOWN OF THOMPSON'S STATION, | ) |
| TENNESSEE, | ) |
| | ) |
| Respondent. | ) |

## AMENDED PETITION FOR WRIT OF CERTIORARI AND WRIT OF SUPERSEDEAS

COMES NOW the Petitioner, Whistle Stop Farms, LLC, by and through its legal

counsel, and brings this action pursuant to Tenn. Code Ann. § 27-9-101 *et seq.* and

hereby petitions this Court to issue a Writ of Certiorari (hereinafter the "Writ") and Writ

of Supersedeas for the review of the official decision of the Board of Mayor and

Aldermen for Thompson's Station, Tennessee, acting on behalf of the Town of

Thompson's Station, Tennessee, revoking sewer taps and sewer capacity allocations

having been previously approved by the Town paid for by the Petitioner, and expressly

relied upon by Petitioner in expending over $1.7 million in furtherance of the

development of Whistle Stop. Petitioner alleges the following as the basis for the

issuance of the Writ:

### Parties, Jurisdiction and Venue

1.      The Petitioner, Whistle Stop Farms, LLC, is a Tennessee limited liability

company, having its principal place of business located at 144 Southeast Parkway, Suite

230, Franklin, Williamson County, Tennessee. Petitioner is in the business of owning,

EXHIBIT
1

improving and developing real property and is the owner of the real property that is the subject of this cause and qualifies as a "small business" for purposes of the Tennessee Equal Access to Justice Act. Tenn. Code Ann. § 29-37-101, *et seq.*

2.     Respondent, the Board of Mayor and Aldermen for Thompson's Station, Tennessee (hereinafter the "Board") acts on behalf of the Town of Thompson's Station, Tennessee (the "Town"). The Board created the Thompson's Station Municipal Planning Commission (hereinafter the "MPC") and delegated to it the land use planning function of the Town. Tenn. Code Ann. § 13-4-101.

3.     The Board may be served with process upon Corey Napier, Mayor of Thompson's Station, Tennessee, 2691 Pantall Road, Thompson's Station, Tennessee 37179. Tenn. R. Civ. Pro. Rule 4.04(8).

4.     Jurisdiction and venue are proper in the Chancery Court for Williamson County, Tennessee. Tenn. Code Ann. § 13-4-101.

Facts

5.     On December 4, 2012, Petitioner purchased real property consisting of approximately 142.47 acres located in the Town at 1565 Thompson's Station Road W., Thompson's Station, Tennessee 37179 (hereinafter the "Property") for the purpose of developing a proposed 343 lot, multi-section residential subdivision to be known as "Whistle Stop".

6.     The Whistle Stop development is the subject of this Writ to which sewer capacity for 343 residential lots has been reserved. Whistle Stop Phase I is a portion of the Whistle Stop development and is proposed to contain 46 residential lots (hereinafter "Phase I").

2

7.     Petitioner reserved sewer capacity for Whistle Stop's 343 residential lots via the payment of capacity allocation fees to the Town, as provided for in Town Ordinance No. 09-003 and which the Town accepted. Pursuant to representations made by then-Town administrator Greg Langliers via email on October 14, 2013, capacity allocation must be reserved for the entirety of the Whistle Stop development prior to, or in conjunction with, the submittal of a preliminary plat for Phase I. Accordingly, Petitioner properly reserved capacity allocation for all 343 residential lots in Whistle Stop.

8.     The Thompson's Station Municipal Code (hereinafter the "T.S.M.C.") contains the codified and revised ordinances of the Town and specifically provides developers with the policies and procedures required for submission of preliminary plats and requests to extend or connect to the public sewer. T.S.M.C. Title 18.

9.     On October 22, 2013, the MPC considered and approved with certain contingencies, the Preliminary Plat for Whistle Stop Phase I (hereinafter the "Preliminary Plat").

10.     On October 22, 2013, the MPC carefully considered and approved Petitioner's request for connection to the Town's sewer system to service Phase I, specifically stating in its record of action the following:

> Sewer availability was granted by the Planning Commission for Phase 1 of Whistle Stop only up to 46 units based upon the current capacity in the Heritage Commons facility. Pursuant to the Town's ordinances, the developer shall be responsible for all costs of planning, design and construction of any improvements necessary to transport wastewater to Town treatment facilities. The Town cannot confirm that sewer capacity is available for the remainder of the proposed development *at this time*. (emphasis supplied) (hereinafter the "Sewer Approval").

3

Complete and exact copies of the Preliminary Plat, the record of action of the MPC and the minutes from the October 22, 2013 MPC meeting, are attached hereto, marked as Collective Exhibit A and are incorporated herein by reference.

11.     Accordingly, while capacity may not have been available on that date, Petitioner had already been allocated sewer capacity by the Town for the balance of the development and secured its priority for that capacity when it necessarily became available in the future.

12.     On June 30, 2014, the Town, through its engineering consultant, certified that the Development Plans for Whistle Stop Section 1A, which included, among other things, utility plans and sanitary sewer plans (hereinafter the "Development Plans"), were in compliance with all Town and other associated regulations.

13.     On June 30, 2014, the Town issued a Grading Permit authorizing Petitioner to begin "grading, installing roadways, storm drainage systems, utilities and erosion control devices…" for Whistle Stop Section 1A (hereinafter the "Grading Permit"). A complete and exact copy of the Grading Permit is attached hereto, marked as Exhibit B and is incorporated herein by reference.

14.     On July 8, 2014, the Tennessee Department of Environment & Conservation Division of Water Pollution Control (hereinafter "TDEC") considered and approved the Development Plans for construction. A complete and exact copy of the Development Plans is attached hereto, marked as Exhibit C and is incorporated herein by reference.

15.     Upon obtaining the Sewer Approval, and in reliance on the approvals of the Preliminary Plat and the Development Plans and the issuance of the Grading Permit, Petitioner commenced work on the Property in furtherance of the development and

4

incurred costs, expenses and obligations associated with the Whistle Stop development in the approximate amount of $1,765,269.71, including approximately $115,000.00 in sewer tap fees for sewer connections in Phase I and approximately $3,430.00 for sewer capacity fees for all 343 lots in Whistle Stop.

16.     The work performed, and expenses and obligations incurred by Petitioner, were necessary for the development as a whole and not solely for Phase I. Accordingly, the work was performed in reliance on the Town's allocation of capacity for all 343 Whistle Stop lots as evidenced by its acceptance of the full sewer capacity allocation fee. But for the Town's agreement to allocate sufficient sewer capacity to the entire development, Whistle Stop would not have engaged in its extensive and expensive efforts in relation to the development.

17.     The Town never refunded the $115,000.00 paid for tap fees for sewer connections in Phase I or the $3,430.00 for sewer capacity fees for the 343 lots in Whistle Stop.

18.     In July of 2014, the Town, by and through its Town Administrator, Joe Cosentini, intimated that Whistle Stop's approvals, which necessarily included the Sewer Approval and the reservation of capacity allocation, might need to be "re-approved" by the Town. However, Mr. Cosentini confirmed that Whistle Stop was indeed entitled to the previously-approved Preliminary Plat for Phase I, sewer availability for same, and construction documents for 27 of Phase I's 46 lots.

19.     However, on August 8, 2014, Todd Moore, counsel for the Town, represented to Petitioner that all of Whistle Stop's approvals to date were fine and that there would be no need to return to the Planning Commission or the Board for approvals that were already properly issued.

5

20.    In January 2015, the Town reversed course when Mr. Cosentini advised Petitioner that it was, in fact, the Town's position that Petitioner would be required to re-submit its request for approval to the Board.

21.    Mr. Cosentini advised Petitioner that the re-hearing was simply a formality to correct an alleged procedural oversight by the Town and assured Petitioner that the Board would "re-approve" the prior approval.

22.    Despite the fact that the Sewer Approval had been properly approved by the MPC, given Mr. Cosentini's request that Petitioner go through this "formality" at the Town's request, and in reliance on his assurance, the Petitioner complied with his request.

23.    Mr. Cosentini wrote to the Board on February 4, 2015 and recommended the re-approval of the Sewer Approval stating that it "is reasonable to allow a temporary connection to the Heritage Commons facility in order for phase 1 to continue *as approved by the Town*." (emphasis supplied)

24.    On February 10, 2015, the Board held a public meeting and revoked the Sewer Approval. This effectively revoked Petitioner's reservation of sewer capacity, as well, when the Board stated it intended to "start all over from the top of Whistle Stop" (hereinafter the "Board's Final Decision").

25.    Petitioner has a special interest in the Board's Final Decision and is subject to special injury not common to the public.

26.    The MPC has broad power to perform its purposes and promote municipal planning. Tenn. Code Ann. § 13-4-103.

27.   The MPC has the specific power to review and approve proposed construction affecting public streets and spaces, among other public interests and to approve the location and the extent of public utilities. Tenn. Code. Ann. § 13-4-104.

28.   The T.S.M.C. provides developers with the policies and procedures required for submission of requests to extend or connect to the public sewer. T.S.M.C. Title 18.

29.   The T.S.M.C. provides that extensions and connections to the public sewer require approval of TDEC and the Town's designated agent. T.S.M.C. Title 18-117.

30.   The T.S.M.C. requires that preliminary plats be submitted to the MPC for approval. T.S.M.C. Title 18-119.

31.   The T.S.M.C. does not grant authority to the Board to consider, review or approve requests for capacity allocations, extensions and connections to the public sewer.

32.   Tennessee law does not grant authority to the Board to consider, review or approve requests for extensions and connections to the public sewer unless the MPC has first disapproved the request. Tenn. Code Ann. § 13-4-104.

33.   Petitioner submitted its request for sewer approval in compliance with the T.S.M.C. and, the MPC, in performing the duties delegated it by the Board and within the authority granted it by statute and by the T.S.M.C., approved Petitioner's request.

34.   The Board's Final Decision was illegal because the Board acted without authority and exceeded its jurisdiction when it reviewed and considered the MPC's Sewer Approval.

35.   If this Court finds that the Board did have the authority to review and consider the MPC's Sewer Approval, Petitioner would state that the Board's Final Decision was arbitrary, capricious and unsupported by material evidence.

36. By arbitrarily revoking the Sewer Approval, the Board violated Petitioner's rights to substantive due process protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Tennessee Constitution, all in violation of 42 U.S.C. § 1983.

37. Petitioner requests that this Court, pursuant to Tenn. Code Ann. § 27-9-106, issue a Writ of Supersedeas to prevent the Town and its agencies, boards, commissions, administrators or delegates, from revoking any previously approved requests of Petitioner which relate to Whistle Stop and to maintain the status quo so that prior approvals do not expire during the pendency of this cause, including, but not limited to, the Preliminary Plat, the Grading Permit, the Sewer Approval, and sewer capacity allocation.

PREMISES CONSIDERED, Petitioner requests the following relief:

1. That an Amended Writ of Certiorari be issued to the extent necessary and remain in effect, requiring the Respondent to certify and immediately file with the Clerk and Master of this Court, the official record from the Board's meeting on February 10, 2015;

2. That Respondent be required to answer this Amended Petition as required by law;

3. That upon the hearing of this cause, this Court find that the Board lacked authority to review and consider the Sewer Approval and order the Board's Final Decision to be null and void, or otherwise order its reversal, and reinstate the Sewer Approval;

4. That upon the hearing of this cause, this Court find that the Board exceeded its jurisdiction and acted unlawfully when it reviewed and considered the Sewer Approval and order the Board's Final Decision to be null and void, or otherwise

8

order its reversal, and reinstate the Sewer Approval and allocation of sewer capacity pursuant to which the Grading Permit was issued and in reliance on the Petitioner incurred substantial liabilities and expenses;

5. That, in the event this Court finds that the Board had the authority to review, consider and revoke the Sewer Approval, this Court find that the Board's Final Decision was arbitrary, capricious and unsupported by material evidence;

6. That this Court find that the Petitioner acquired vested rights pursuant to the Sewer Approval, the allocation of sewer capacity, and upon the issuance of the Grading Permit and order that the Board be estopped from revoking the Sewer Approval and/or allocation of sewer capacity;

7. That an Amended Writ of Supersedeas, pursuant to Tenn. Code Ann. § 27-9-106(a), maintaining the status quo of all approvals having been granted the Petitioner by the Town, its agencies, boards, commissions, administrators or delegates, and staying the effect of the Board's decision revoking the 46 sewer taps in relation to Phase I and effectively revoking Petitioner's allocation of capacity for the entirety of the 343 lots in Whistle Stop, be issued to the extent necessary by the Chancellor and remain in effect until otherwise ordered by this Court; and

8. That upon the hearing of this cause, this Court find that Petitioner is entitled to an allocation for sewer capacity in the Town's system for 343 sewer connections for Whistle Stop, effective as of November 18, 2013, the date the Petitioner paid to reserve that capacity;

9

9. That Petitioner be awarded its reasonable and actual attorney's fees and other expenses incurred as a result of the Board's arbitrary action pursuant to 42 U.S.C. § 1988;

10. That, in the alternative, Petitioner be awarded its reasonable and actual attorney's fees and other expenses pursuant to Tennessee Code Annotated § 29-37-104;

11. That Petitioner reserves the right to amend and seek additional relief, damages, or other remedies; and

12. That Petitioner be granted such further relief as deemed necessary and appropriate by this Court.

**THIS PETITION, AS AMENDED, IS THE FIRST APPLICATION FOR A WRIT IN THIS MATTER AND NO APPLICATION FOR A WRIT HAS BEEN DENIED.**

Respectfully submitted,

_____

Douglas S. Hale, BPR #6669
HALE AND HALE, PLC
231 Public Square, Suite 312
Franklin, Tennessee 37064
P: (615) 794-1312
F: (615) 790-9236
doug@haleandhale.com

*and*

Joshua R. Denton, BPR #23248
Thomas McFarland, BPR #33432
GULLETT, SANFORD, ROBINSON
& MARTIN, PLLC
150 Third Avenue South, Suite 1700
Nashville, Tennessee 37201
P: (615) 244-4994
F: (615) 256-6339
jdenton@gsrm.com
tmcfarland@gsrm.com

*Counsel for Petitioner Whistle Stop Farms,
LLC*

11

## VERIFICATION

STATE OF TENNESSEE )
COUNTY OF WILLIAMSON )

I, J. N. Franks, III, after first having been duly sworn according to law, do hereby acknowledge that I, as the Managing Member of Whistle Stop Farms, LLC, have read the foregoing Amended Petition for Writ of Ceriorari and Writ of Supersedeas and hereby state that the same is true and correct to the best of my knowledge, information and belief.

Witness my hand, at office, this _____ day of November, 2016.

WHISTLE STOP FARMS, LLC

By: _____
J. N. Franks, III
Managing Member

Sworn to and subscribed before me on this _____ day of November, 2016.

_____
**Notary Public**

My Commission Expires: _____



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
PRELIMINARY PLAT

EXHIBIT
A



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION RD.
PRELIMINARY PLAT

Case 3:16-cv-03809   Document 1-2   Filed 12/28/16   Page 17 of 59 PageID #: 106

# Town of Thompson's Station
## Municipal Planning Commission
## Minutes of the Meeting
## October 22, 2013

### Call to Order

The meeting of the Municipal Planning Commission of the Town of Thompson's Station was called to order at 7:00 p.m. on the 22nd day of October, 2013, at the Thompson's Station Community Center with the required quorum. Members and staff in attendance were: George Ross, Chair; Tom Evans, Secretary; Carl Hubert, Commissioner; Sarah Benson, Commissioner; Jack Elder, Commissioner; Willis Gilliam, Commissioner; Brad Wilson, Commissioner; Greg Langeliers, Town Administrator; Wendy Deats, Town Planner; Doug Goetsch, Town Finance Director; Richard King, Building Official; Town Attorney Todd Moore; and Leah Rainey, Town Recorder.

### Consideration of the Minutes.

The minutes from the September 24th, 2013 meeting were previously submitted. Commissioner Evans moved for approval of the minutes as submitted. The motion was seconded and carried unanimously.

### Announcements by Staff.

Mr. Langeliers reminded everyone that the November Planning Commission meeting had been rescheduled for November 19th at 7:00 p.m. in the Community Center.

Mrs. Deats recapped various park improvements that had been completed.

### Old Business.

**Update on Mars mechanical equipment**—Mrs. Deats said staff Mars had presented a plan for screening rooftop equipment after concerns had been raised by Planning Commissioners about its visual impact. She said staff had reviewed the plan and felt it was satisfactory.

> Commissioner Wilson moved to approve the new screening as an amendment to the previously approved site plan. The motion was seconded and carried unanimously.

### FINAL PLAT:

### 1. Section 2B for the creation of 26 single-family lots and 3 open space lots in Bridgemore Village (File: 1-D-13-007)

Mrs. Deats reviewed her staff report and recommended approval based on the project's consistency with the development agreement for Bridgemore Village, the town's Zoning Ordinance, Subdivision Regulation and open space requirements. She recommended approval with the contingencies that, prior to recordation of the final plat, a Letter of Credit in the amount of $138,000 be submitted for roads, grading drainage and erosion control, and a Letter Credit in the amount of $36,000 be submitted for sewer.

> Commissioner Elder moved for approval with staff's recommended contingencies. The motion was seconded and carried unanimously.

**PRELIMINARY PLAT:**

### 2. Whistle Stop (File: 1-C-13-011)

Mrs. Deats reviewed her staff report and said staff required some additional information for a traffic study. The applicant has retained an engineer to do the traffic study per the town's requirements. She also said she had some concerns about lot widths and would recommend increasing them to 50 feet.

Mrs. Deats said she had no other concerns but she could not recommend approval without the issuance of a sewer availability letter. She said the applicant and staff were available for questions.

Commissioner Ross asked about off-site water availability. Mrs. Deats said preliminary design plans were in the works; HB&TS had indicated they would provide service.

Commissioner Ross asked how long it would take to get a comprehensive traffic study. Applicant representative Greg Gamble said he expected to outline the scope of the traffic study within a week and that the engineer would be recommending appropriate timing for incremental improvements.

Mr. Gamble gave a PowerPoint presentation overview of the plan.

The Commission discussed water flow and drainage, placement of HVAC units, lot widths and access.

**After discussion, Commissioner Ross moved to defer until next month to give the applicant a chance to work further on the traffic study.**

Commissioner Evans said he wanted to have a discussion about sewer availability and whether the town's facilities had capacity to accommodate this development.

Mr. Langeliers said the capacity of the treatment plant was roughly 15,000 gallons per day according to numbers from HB&TS, and it is permitted for 30,000 gallons per day. Based on those assumptions, Heritage Commons has some capacity. However, there were still some vacant lots in Heritage Commons that would require capacity if they were developed. Mr. Langeliers said that a highly conservative perspective could find that there is not enough capacity, while a more liberal perspective could find that there is capacity.

Commissioner Gilliam asked how much this development would owe in tap fees.

Mr. Langeliers said about $1.8 million.

Commissioner Gilliam asked if that would be enough money to fix the sewer problems, assuming there were any.

Mr. Langeliers said it could go along way toward fixing problems or even potentially be used to construct a new facility.

Commissioner Gilliam said, given that the Heritage Commons facility was operating at roughly half of its treatment capacity, it seemed there was at least enough capacity for the first phase of Whistle Stop.

**Commissioner Ross withdrew his motion.**

Commissioner Benson asked Mr. Gamble for some input on how the town might increase capacity at the Heritage Commons facility, whether that might include additional equipment, property acquisition, or other means.

Mr. Gamble said some options included building a third cell or adding additional drip fields.

Commissioner Benson asked who would bear the cost of the improvements.

Mr. Gamble said $2,400 per lot would be paid to the town for system development, and he thought there were some opportunities for partnerships with the town.

Commissioner Benson asked what the anticipated timeline was for buildout.

Mr. Gamble said a year and a quarter or so for the first phase; 5-6 years total for the project.

Applicant Jay Franks said he thought it was important for the town to determine a long-range plan that included incremental expansions and improvements as further development occurs. He asked that the Commission consider permitting the first 46 lots while further investigating and planning for future and long-term sewer availability. He said he was willing and prepared to pay fees for the necessary improvements.

Commissioner Benson said it was unclear whether the current fees were adequate; that's why she wanted to know more about the projected timeline.

She then discussed the potential future road through privately owned property.

Mr. Franks said he personally didn't feel a secondary access was needed, but since the town had requested it they were showing it on the preliminary plat in case it was needed.

Commissioner Benson referred to Mr. Franks' letter to the commissioners and board members which suggested that the town may need to implement a moratorium.

Mr. Franks said operating sewer as a utility was a big responsibility for the town and if the town was not prepared to grant further capacity, an official moratorium ought to be enacted. He said it was something that needed to be a priority and be worked on in a systematic way.

Commissioner Benson said she thought the town had done a lot of work toward resolving issues with TDEC and repairing cell two.

Commissioner Wilson said he wouldn't have a problem approving the initial 46 lots if the Heritage Commons facility could handle that volume. He said the town was at a crossroads with regard to development and that a group of experts, engineers and city officials should look further into the sewer issues soon and help design some long-range plans. He said the next five or ten years could bring sewer demands beyond the current capacity, so it needed to be looked at.

Mr. Gamble said the applicant would be comfortable with an incremental sewer availability letter.

> **Commissioner Gilliam moved for a short recess. The motion was seconded and carried unanimously.**

The meeting reconvened at 8:16 p.m.

Commissioner Wilson made a motion to approve the preliminary plat for the first 46 lots of Whistle Stop with the following contingencies: 1) that lot widths be increased to 50 feet and that setbacks for the primary structures be consistent with 5 feet on the sides and 20 feet in the rear, with rear-yard garages allowed a zero lot line setback ; 2) that the traffic study be completed per the scope set by town staff; 3) a development agreement be entered into by the applicant; 4) a schedule for off-site water improvements be submitted; 5) the location of the lift station be determined by staff; 6) payment of preliminary platting fees and sewer fees. The motion was seconded and carried unanimously.

## DEVELOPMENT PLAN:

### 3. Clayton Arnold Residential Project (File: 1-A-13-005)

Mrs. Deats introduced the project and reviewed her staff report. She said the applicant was aware that no entitlement was granted with the review of a development plan. She said the project was in compliance with the codes as a cluster development and recommended the Planning Commission direct him to move forward in the process.

The applicant Daniel Woods discussed his project and said he understood that there was no guarantee of sewer availability at this point and that he was moving forward on the project at his own risk.

After discussion, Commissioner Gilliam made a motion to direct the applicant to proceed. The motion was seconded and carried unanimously.

## ZONING ORDINANCE AMENDMENT:

### 4. Amendments to the Zoning Ordinance (File: 6-A-13-011)

Mrs. Deats reviewed her staff report and outlined the changes since first reading of the ordinance by the Board of Mayor and Aldermen, including sections on transfer of density, definitions, and open space requirements, which had been reverted back to 50 percent at the request of a board member.

Commissioner Gilliam said the vote was unanimous at First Reading with open space at 45 percent, which is what the Planning Commission has recommended.

Commissioner Evans said 50 percent was really high for an open space requirement.

Mrs. Deats said she could go back to the board and say that the Planning Commission asked that the 45 percent be reconsidered.

Mr. Moore said the Planning Commission could make a recommendation to accept the amendments as submitted, to not accept them, or to accept them with changes. The board could decide to accept or reject the Planning Commission's recommendation.

Mr. Langeliers said 45 percent had passed unanimously with no discussion at first reading; the board would have a chance to request the modification to 50 percent by bringing it up at second reading before final vote.

Commissioner Evans requested a definition be added for modular homes.

Commissioner Evans discussed density and pointed out that property lines often go to the center of roads

in Thompson's Station, and he felt that rights-of-way should be included when calculating density because the property owners are paying taxes on that property.

Mr. Moore said it was typical to exclude area in a right-of-way even if the underlying property goes to the center line of a road, because it is impossible to build density in that space. Many jurisdictions measure setbacks from the right-of-way and give credit for what is dedicated. "Any other encumberances" was somewhat vague and could use further clarification.

Mrs. Deats noted that the Commission had requested flood plains and hillsides be included in density calculations; she could work with Mr. Moore on some additional language that would also include easements and rights-of-way.

Alderman Cooper, who was in the audience, said she felt the town needed to be careful about excluding certain types of property in density calculations because other jurisdictions in the area didn't do that.

Mr. Langeliers said for the vast majority of developments, the difference such exclusions make in terms of density wouldn't be more than one or two units. He said he didn't consider it would have a marked impact either way.

Mr. Moore noted that if the town wants to encourage trails, then giving density credit for dedication of public rights-of-way is a good incentive. If the town calculates density on the gross acreage, that incentive would not be there. He added that it was pretty standard to not give credit for the ground under the pavement of existing roadways.

After further discussion, Commissioner Gilliam moved to recommend the Zoning Amendments to the Board of Mayor and Alderman with the changes that 1) the Open Space requirement be reverted back to 45 percent, 2) that the exclusions for calculating density be stricken, so that the definition reads "the total number of residential units permitted on a gross acre of land" and 3) the addition of the modular home definition. The motion was seconded and carried unanimously.

**New Business.**

**Adjourn.**

There being no further business, the meeting was adjourned at 9:22 p.m.

Signed: _____

George Ross, Chair

Attest: _____

Tom Evans, Secretary

# Town of Thompson's Station

Permit No. 107

## Grading Permit

Issuance of this permit constitutes authorization by the Town of Thompson's Station to begin grading, installing roadways, storm drainage systems, utilities and erosion control devices on the following site:

Development Name: Whitestone Phase 1,5,1A

Location: Whitestone Section 1A

Developer: Waterbrook Farms LLC

Contractor: Enterprise Cont, TN Lic. No. 27119

_____
City Official

10-30-14
Date

This permit shall be enclosed in a transparent waterproof envelope and shall be displayed on site in a clearly visible location. Unless otherwise granted by written permission, this permit expires nine (9) months from the date shown above. By signature above, the Contractor acknowledges that he/she is well acquainted with the construction plans for this project and the required installation and maintenance of erosion control devices. Additionally, the contractor acknowledges that he/she is well aware of necessary safety precautions (protective clothing, utility trench stabilization, flashing lights, barricades, etc.) for the protection of both employees and the general public. Failure to maintain proper safety procedures and erosion control will be sufficient cause for the Town to place a STOP WORK ORDER on this project. THIS PERMIT IS SUBJECT TO ANY ATTACHED CONDITIONS.

**EXHIBIT B**



# DEVELOPMENT PLANS
## FOR
## WHISTLE STOP
### 1565 THOMPSON STATION RD.
### WILLIAMSON COUNTY, TN 37206
#### JUNE 16, 2014

**SITE LOCATION & CONTROL POINTS MAP**
NTS

WHISTLE STOP SUBDIVISION

**VICINITY MAP**
SCALE: 1" = 2000'

14-BU91

## INDEX OF DRAWINGS:

| | |
|---|---|
| C0.0 | TITLE SHEET |
| C0.1 | EXISTING CONDITIONS |
| C1.0 | SITE PLAN |
| C1.1 | UTILITY PLAN |
| C1.1.1 | SITE PLAN DETAILS |
| C1.2 | SITE PLAN DETAILS |
| C1.3 | ESPC PLAN PHASE 1 |
| C1.4 | ESPC PLAN PHASE 2 |
| C1.5 | ESPC PLAN PHASE 3 |
| C1.5.1 | TEMPORARY SEDIMENT POND DETAIL |
| C1.6 | TEMPORARY SEDIMENT POND DETAIL |
| C2.0 | MASS GRADING PLAN |
| C2.1 | DRAINAGE AREAS PLAN |
| C2.2 | BRAKEMAN LANE PLAN & PROFILE |
| C2.3 | BURDEN LANE PLAN & PROFILE |
| C2.4 | UNION STATION ROAD PLAN & PROFILE |
| C3.0 | FLAGSTAFF LANE PLAN & PROFILE |
| C3.1 | STORMWATER MANAGEMENT PLAN |
| C4.0 | WATER QUALITY SWALE PLAN & PROFILE |
| C4.1 | UTILITY DETAILS |
| C5.1 | SANITARY SEWER LINE 1 & 2 PROFILE PLAN |
| C5.2 | SANITARY SEWER LINE 3 PROFILE PLAN |
| C5.3 | SANITARY SEWER LINE 4 PROFILE PLAN |
| C5.4 | SANITARY SEWER FORCE MAIN |
| C5.5 | NOT USED |
| C5.6 | PUMP STATION - WET WELL |
| C5.7 | NOT USED |
| C5.8 | SANITARY SEWER DETAILS |
| L1 | LANDSCAPE PLAN |

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A

EXHIBIT
C

Case 3:16-cv-03309  Document 1-2  Filed 12/28/16  Page 24 of 59 PageID #: 113



100 YEAR FLOOD PLAIN
PRE-CONSTRUCTION
797.29

100 YEAR FLOOD PLAIN
PRE-CONSTRUCTION
798.80'

SECTION 1A

100 YEAR FLOOD PLAIN
PRE-CONSTRUCTION
799.55

SECTION 1B

WET WEATHER CONVEYANCE
WITH 25' BUFFER
50' TOTAL

SECTION 1A
AREA=
394,511.09 SF*
9.06 AC

SECTION 1A

100 YEAR FLOOD PLAIN
PRE-CONSTRUCTION
100 YEAR FLOW- 520.70 CFS
100 YEAR FLOOD PLAIN ELEVATION - 792.66'

SECTION 1A

FUTURE
SECTION 1B

SECTION 1A

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
EXISTING CONDITIONS

THR 140527

| REVISIONS | | |
|---|---|---|
| 3 | REVISED PER T.O.T.S. PLANNING COM. | 10-23-13 |
| 4 | REVISED PER T.O.T.S. | 08-19-14 |
| 5 | REVISED PER T.O.T.S. | 08-20-14 |
| 6 | REVISED PER T.O.T.S. | 08-30-14 |



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A

Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 26 of 59 PageID #: 115



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SITE PLAN DETAILS

DOUBLE INLET DETAIL

TYPICAL ROADWAY SECTION

DRAINAGE DITCH SECTION

BEDDING TYPES FOR R.C.P. PIPES

WINGED HEADWALL

SINGLE CURB INLET

EXTRUDED CONCRETE CURB
NOT TO SCALE

WINGED HEADWALL
W/ ENERGY DISSIPATERS



PEDESTRIAN CROSSWALK

DETAIL OF INLET SEDIMENT CONTROL DEVICE WITH CURB DEFLECTOR

ROCK FILTER

SECTION A-A

SILT FENCE BELOW A STEEP OR LONG GRADE

SILT FENCE

CHANNEL INSTALLATION

JOINING SILT FENCE SECTIONS

OUTLET PROTECTION

STONE CONSTRUCTION EXIT

TURF REINFORCEMENT MATTING






DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SITE PLAN DETAILS

| | REVISIONS | |
|---|---|---|
| 2 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 |
| 3 | REVISED PER T.O.T.S. PLANNING COM. | 10-22-13 |
| 4 | REVISED PER T.O.T.S. | 06-19-14 |
| 5 | REVISED PER T.O.T.S. | 06-25-14 |

Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 28 of 59 PageID #: 117



Case 3:16-cv-03309  Document 1-2  Filed 12/28/16  Page 29 of 59 PageID #: 118

DEVELOPMENT PLANS FOR
WHISTLE STOP
1585 THOMPSON STATION ROAD
EPSC PLAN  PHASE I



Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 30 of 59 PageID #: 119

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
EPSC PLAN   PHASE 2



GRADING & DRAINAGE PLAN
SCALE 1"=50.0'

DETENTION POND 1

SCHOOL STREET

LEGEND
SILT FENCE
STONE CHECK DAM
EXISTING CONTOUR
PROPOSED CONTOUR
LOT NUMBER

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A

Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 31 of 59 PageID #: 120

TNR 148927



SEDIMENT POND 2

Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 32 of 59 PageID #: 121

SECTION 1-A DEVELOPMENT
PLANS WHISTLE STOP
1565 THOMPSON STATION ROAD
WILLIAMSON COUNTY, TN 37179
EPSC PLAN DETAILS

REVISIONS
1   DEVELOPMENT PLANS SUBMITTAL   01-28-14
2   TOWN COMMENTS   02-03-14



SEDIMENT POND 1

SECTION 1-A DEVELOPMENT
PLANS WHISTLE STOP
1565 THOMPSON STATION ROAD
WILLIAMSON
EPSC PLAN DETAILS

REVISIONS
1  DEVELOPMENT PLANS SUBMITTAL   01-20-14
2  TOWN COMMENTS                 03-05-14



Case 3:16-cv-03309 Document 1-2 Filed 12/28/16 Page 34 of 59 PageID #: 123

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
DRAINAGE AREAS PLAN



Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 35 of 59 PageID #: 124

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
MASS GRADING PLAN



DEVELOPMENT PLANS FOR
WHISTLE STOP
1585 THOMPSON STATION ROAD
BRAKEMAN WAY - PLAN & PROFILE

Case 3:16-cv-03309  Document 1-2  Filed 12/28/16  Page 36 of 59 PageID #: 125



Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 37 of 59 PageID #: 126

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
BURGIN LANE PLAN & PROFILE



Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 38 of 59 PageID #: 127

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SECTION 1A
UNION STATION ROAD PROFILE PLAN



Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 39 of 59 PageID #: 128

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
FLAGSTAFF LANE PROFILE PLAN





DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
WATER QUALITY SWALE PLAN & PROFILE



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
UTILITY PLAN



DEVELOPMENT PLANS FOR
WHISTLE STOP

UTILITY DETAILS

Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 43 of 59 PageID #: 132



Case 3:16-cv-03309 Document 1-2 Filed 12/28/16 Page 44 of 59 PageID #: 133

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SANITARY SEWER LINE 1 & 2 PROFILE PLAN





Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 45 of 59 PageID #: 134



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SANITARY SEWER LINE 3 PROFILE PLAN



| | REVISIONS | |
|---|---|---|
| 3 | DEVELOPMENT PLANS SUBMITTAL | 03-14-14 |
| 4 | REVISED PER T.O.T.S. PLANNING COM. | 10-23-13 |
| 4 | REVISED PER T.O.T.S. | 08-19-14 |
| 3 | REVISED PER T.O.T.S. | 08-20-14 |



TNR 148927



Case 3:16-cv-03309 Document 1-2 Filed 12/28/16 Page 46 of 59 PageID #: 135

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
SANITARY SEWER LINE 4 PROFILE PLAN



Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 47 of 59 PageID #: 136

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD

SANITARY SEWER FORCE MAIN PROFILE PLAN



Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 48 of 59 PageID #: 137



DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION ROAD
PUMP STATION DETAILS



DEVELOPMENT PLANS FOR
WHISTLE STOP
SECTION 1A
SANITARY SEWER DETAILS



SECTION 1A LANDSCAPE PLAN

Case 3:16-cv-03309   Document 1-2   Filed 12/28/16   Page 51 of 59 PageID #: 140

DEVELOPMENT PLANS FOR
WHISTLE STOP
1565 THOMPSON STATION RD.
SECTION 1A

NPDES # XXXX    SWGR T20130XXXX

🛈 Cited
As of: November 18, 2016 12:18 PM EST

# *Kiger v. Nixon*

Court of Appeals of Tennessee, Western Section, at Nashville

September 11, 1996, FILED

Appeal No. 01A01-9511-CH-00501

**Reporter**
1996 Tenn. App. LEXIS 565 *; 1996 WL 512031

BILL KIGER, PAYNE C. GORDON, BARBARA BRIDGES, CHARLES CARMEN and JEAN HOLMES, in their capacity as officers of the Nashville Electric Service Employees Association, Inc., Petitioners/Appellants VS. BETTY NIXON, DR. ALBERT BERRY, JAMES JOHNSON, KEVIN LAVENDER and TOM JACKSON, in their capacities as members of the Electric Power Board and the Electric Employees Civil Service and Pension Board of the Metropolitan Government of Nashville and Davidson County, Tennessee, Respondents/Appellees.

**Prior History:** [*1] APPEAL FROM THE CHANCERY COURT OF DAVIDSON COUNTY AT NASHVILLE, TENNESSEE. THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR. Davidson Chancery No. 90-3354-I.

**Disposition:** AFFIRMED

## Core Terms

employees, data processing, Charter, outsourcing, Metropolitan, writ of certiorari, provisions, common law, operations, positions, accepting employment, electric, exceeded, illegally, trial court, constructive, civil service provisions, summary judgment motion, summary judgment, Petitioners', vacated

## Case Summary

### Procedural Posture

Petitioners, officers of the Nashville Electric Service Employees Association (NESEA), challenged the judgment of the Chancery Court of Davidson (Tennessee), which granted the motion of summary judgment of respondents, the Board of Directors (Board) of the Nashville Electric Service (NES). The NESEA filed an action to invalidate the Board's decision to outsource its data processing operations to a private sector vendor.

### Overview

The trial court held that NESEA, a voluntary association of NES employees, had standing to bring its claim that the Board violated the Metropolitan Charter by acting illegally and exceeding its jurisdiction, but the claim should have been brought under a common law writ of certiorari. The trial court granted summary judgment for the Board on NESEA's Open Meetings Act claim, which sought reinstatement for the employees. The trial court found that the remedy was unavailable and could not be joined properly with a common law writ of certiorari. NESEA filed an amended petition for writ of certiorari alleging that the Board had acted illegally, had exceeded its jurisdiction, and had constructively discharged its employees. The trial court again granted summary judgment in favor of the Board. On appeal, the court affirmed the judgment of the trial court. The court found that the Board's decision to outsource, which was an administrative function, was challenged properly by petition for common law writ of certiorari. The court did not find that the Board's decision to outsource was illegal, arbitrary, or capricious. The court found no support for the claim for constructive discharge.

### Outcome

The court affirmed the judgment of the chancery court, which granted summary judgment in favor of the Board.

## LexisNexis® Headnotes

Civil Procedure > ... > Justiciability > Standing > General Overview

Civil Procedure > Judgments > Relief From Judgments > General Overview

*HN1* Standing is a judicially-created doctrine employed

**EXHIBIT**

by courts in determining whether a party is entitled to judicial relief. In order to establish standing, a party must demonstrate to the court that: (1) It sustained a distinct and palpable injury, (2) that the injury was caused by the challenged conduct, and (3) that the injury is apt to be redressed by a remedy that the court is prepared to give.

Civil Procedure > ... > Justiciability > Standing > General Overview

Environmental Law > Solid Wastes > Disposal Standards

*HN2* Where a plaintiff's standing is brought into issue, the pertinent inquiry is whether the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Standing often turns on the nature and source of the claim asserted. Thus, the inquiry requires a careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.

Civil Procedure > ... > Justiciability > Standing > General Overview

*HN3* The standing requirement imposes a duty upon petitioners to allege a particularized injury concretely and demonstrably flowing from the action of the defendants that will be redressed by the remedy sought. Petitioners must demonstrate to the court that they suffered a distinct and palpable injury.

Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review

*HN4* Tenn. Code Ann. § 27-8-101 provides that the writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court there is no other plain, speedy, or adequate remedy.

Civil Procedure > Judgments > Declaratory Judgments > General Overview

Civil Procedure > ... > Declaratory Judgments > State Declaratory Judgments > General Overview

Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review

*HN5* In evaluating when an action must be brought pursuant to a petition for common law writ of certiorari, as opposed to an action for declaratory judgment, the

critical inquiry is whether the inferior board exercised either a legislative or an administrative function. In the former case an action for declaratory judgment is appropriate, while in the latter case, a petition for common law writ of certiorari is the proper method by which to challenge an administrative decision. In evaluating whether a particular decision is properly characterized as legislative or administrative, the term administrative is used interchangeably with judicial or quasi-judicial within the meaning of *Tenn. Code Ann. § 27-8-101*. A crucial test in distinguishing legislative from administrative acts is whether the action taken (resolution or ordinance) makes new law or executes one already in existence. In order to qualify as an administrative, judicial, or quasi-judicial act, the discretionary authority of the governmental body must be exercised within existing standards and guidelines.

Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

Civil Procedure > Appeals > Appellate Jurisdiction > State Court Review

*HN6* The scope of review under a common law writ of certiorari is whether the inferior board has exceeded its jurisdiction or has acted illegally, arbitrarily, or fraudulently.

Labor & Employment Law > Wrongful Termination > Constructive Discharge > General Overview

*HN7* A finding of constructive discharge requires the determination that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

**Counsel:** MARIAN F. HARRISON, JEFFREY RAPPUHN, WILLIS & KNIGHT, Nashville, Tennessee, Attorneys for Appellants.

D. KIRK SHAFFER, NANCY A. VINCENT, STOKES & BARTHOLOMEW, P.A., Nashville, Tennessee, Attorneys for Appellees.

**Judges:** ALAN E. HIGHERS, J., CONCUR: W. FRANK CRAWFORD, P.J., W.S., DAVID R. FARMER, J.

**Opinion by:** ALAN E. HIGHERS

## Opinion

Petitioners are officers of the Nashville Electric Service Employees Association ("NESEA"), who brought this

action seeking to invalidate the decision of the Board of Directors ("Board") of the Nashville Electric Service ("NES") to outsource its data processing operations to a private sector vendor. Petitioners alleged that the Board exceeded its jurisdiction and violated certain provisions of the Metropolitan Charter. The trial court granted summary judgment in favor of the Board, holding that the Board's decision was within its jurisdiction and was supported by substantial and material evidence. It is from this judgment that petitioners have appealed.

In 1986, NES contracted with [*2] Seltman, Cobb, and Bryant ("SCB") to design, install, and implement a computer-based management information and data processing system. Following the installation of the system, NES began experiencing numerous problems with its data processing operations, such as overrun of charges and mismanagement by NES employees. In early 1990, Dudley Phillips, general manager of NES, retained the assistance of Walter Smiley, an outside consultant, to advise them as to how to resolve their operational difficulties. At a publicly-advertised meeting of the NES board in October 1990, Smiley stated that the problems had arisen from the inability of top NES management personnel to manage the data processing department and from lack of cooperation on the part of NES' data processing employees. Smiley recommended to the Board that NES outsource its data processing department to SCB. His recommendation was based on the fact that SCB employees currently held many key positions in the data processing department and the fact that SCB employees were already directing most of NES' personnel.

Following a discussion, the NES Board approved a letter of intent to negotiate a professional services contract with [*3] SCB to manage NES' data processing department.

The following day, Phillips prepared and circulated a bulletin to all data processing employees, which stated that the Board had decided to outsource its data processing department and that all employees of that department would be guaranteed a position with SCB at a salary and benefits level equal to or greater than their present salary and benefits.

On October 30, 1990, several officers of NESEA, a voluntary association comprised of non-supervisory NES employees, filed a complaint, alleging certain violations of the Charter of the Metropolitan Government of Nashville and the Open Meetings Act. On November 26, 1990, the petitioners moved to enjoin NES from entering into the outsourcing contract. The trial court denied the motion, holding that there existed a factual issue as to whether the Board had violated the Open Meetings Act and that NESEA possessed an adequate remedy at law.

On November 28, 1990, a special NES board meeting was held to consider the proposed contract between SCB and NES. At the meeting, Joe Martin, counsel for NES, clarified the employment status of current NES employees. He stated that any individual who accepted [*4] employment with SCB would be effectively resigning from NES. If any employee declined to accept employment with SCB, that individual would remain an NES employee, subject to the rules for employees regarding seniority and qualifications.

NES employees filed affidavits stating that on November 28, 1990, Phillips met with the data processing department and told them that the contract was going to be executed. Phillips stated that NES employees should seriously consider accepting employment with SCB because NES would no longer operate the data processing department. NES employees were each provided with a letter from SCB that announced approval of the outsourcing contract and offered employment to NES employees. Petitioners allege that neither NES nor SCB explained to the employees that they had the option of remaining employed at NES if they declined employment with SCB.

On December 1, 1990, the contract between SCB and NES was executed. As a result of this contract, the data processing operations of NES, which formerly had been handled by civil service employees, were assumed by SCB and its employees.

Thirty-six of the forty-two NES data processing employees accepted employment with [*5] SCB. Six employees declined employment with SCB and remained at NES. Following the execution of the contract, most of the data processing operations continued to be performed at the same location, and all former employees of NES received equal to or better rates of compensation than they had received prior to the outsourcing contract.

The trial court granted summary judgment in favor of the Board, holding that petitioners' claims should have been brought under a common law writ of certiorari. The court allowed petitioners to so amend their petition, but granted summary judgment in favor of the Board with respect to their Open Meetings Act and competitive bidding claims on the basis that such claims could not

properly be joined with a petition for writ of certiorari.

Petitioners filed an amended petition for writ of certiorari, alleging that the NES Board had acted illegally, had exceeded its jurisdiction, and had violated certain civil service provisions of the Metro Charter by constructively discharging its employees. Both parties filed motions for summary judgment In support of its motion, the Board argued that NESEA lacked associational standing to bring the action, that the Board [*6] had the authority to outsource the data processing department, and that NES employees waived any right to relief that they may have had by voluntarily relinquishing their employment with NES.

Following oral argument on both parties' motions, petitioners filed a Supplemental Memorandum, alleging a basis for associational standing to bring the action.

The trial judge held that petitioners had the requisite standing to challenge the Board's decision, but granted summary judgment in favor of the Board. The trial judge stated in his Memorandum Opinion as follows:

> On consideration of the record made before the NES Power Board and the cited provision of the Metropolitan Charter, the Court finds that the action of NES outsourcing its data processing department to SCB was legal, within its jurisdiction and supported by substantial and material evidence. Therefore, NES's motion for summary judgment is granted, and NESEA's motion for summary judgment is overruled.

* * * * *

> The employees in the data department had the option of accepting employment with SCB or remaining with NES. There were 43 employees in NES's data processing department. Six (6) NES employees elected to remain [*7] employed with NES. One (1) employee retired and immediately accepted employment with SCB. The remaining employees voluntarily resigned their positions with NES and accepted employment with SCB. (See Affidavit of Herbert W. Deberry, Exhibit C to respondents' Motion for Summary Judgment). The record clearly shows that the NES employees were not constructively laid-off or terminated from their employment NES did not violate the Civil Service provisions of Appendix Three, Chapter 43 of the Metropolitan Charter. Therefore, NESEA's motion for summary judgment is overruled, and NES's motion for summary judgment is granted.

* * * * *

> The decision of NES to out-source its data processing is supported by substantial and material evidence thus, the decision of NES is affirmed. NESEA's amended petition for writ of certiorari is dismissed.

Petitioners have raised two issues on appeal, which are: (1) whether the challenge to NES' decision must be brought pursuant to a common law writ of certiorari; and (2) whether the NES Board violated the Metro Charter's civil service provisions.

Conversely, the Board contends that petitioners lack standing to maintain the present action and [*8] that petitioners waived any objections they might have had to the outsourcing decision by resigning from NES and accepting employment with SCB. We decline to address the Board's second contention regarding waiver as we find it to be without merit.

The Board alleges that petitioners lack standing to bring a claim on behalf of the former NES data processing employees because the complaint failed to allege that either NESEA or any members of NESEA suffered any distinct injury caused by NES' decision to outsource. According to the Board, the only injury claimed by petitioners was the loss of civil service status, which is insufficient to confer standing because it is a mere conclusion of injury without any explanation of harm. The Board also alleges that NESEA lacks standing in its own right to maintain this action because the complaint failed to allege that the association itself suffered any injury. Finally, the Board argues that the relief that petitioners seek would not redress any alleged injury and is not available under a common law writ of certiorari.

Petitioners respond that the individual members of NESEA who worked in the data processing department had standing to institute [*9] the suit because they suffered the damage of termination of their employment from NES. Petitioners contend that NESEA itself suffered damages because the outsourcing decision eliminated dues-paying members of NESEA, which caused NESEA to suffer a decrease in both members and membership dues.

The trial court held that petitioners possessed the requisite standing to bring their claim alleging that the Board acted illegally and exceeded its jurisdiction. However, the court held that petitioners did not have standing to seek the reinstatement of the employees

… 

Page 5 of 8

because such remedy is unavailable under a common law writ of certiorari.

**HN1** Standing is a judicially-created doctrine employed by courts in determining whether a party is entitled to judicial relief. *Knierim v. Leatherwood, 542 S.W.2d 806, 808 (Tenn. 1976).* In order to establish standing, a party must demonstrate to the court that:

> (1) It sustained a distinct and palpable injury, (2) that the injury was caused by the challenged conduct, and (3) that the injury is apt to be redressed by a remedy that the court is prepared to give.

*Metropolitan Air Research Testing Authority, Inc. V. Metropolitan Govt. Of Nashville [*10] and Davidson County, 842 S.W.2d 611, 615 (Tenn. App. 1992).*

**HN2** Where a plaintiff's standing is brought into issue, the pertinent inquiry is whether the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Tennessee *Environmental Council v. Solid Waste Disposal Control Bd., 852 S.W.2d 893, 896 (Tenn. App. 1992).* As this court stated in Metropolitan Air Research, "Standing often turns on the nature and source of the claim asserted. Thus, the inquiry requires a careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *842 S.W.2d at 615.*

In their Amended Petition for Writ of Certiorari, petitioners alleged as follows:

> 11. In approving the SCB contract, the Power Board abolished and vacated all civil service positions (approximately forty-one) in its data processing department and transferred those positions which were necessary to the provision of NES electric services, to SCB. In addition to abolishing and vacating these positions and delegating its responsibilities to a third party, the Power Board effectively [*11] laid off or dismissed the employees filling those positions. . . .

* * * * *

> G. Finally, the Charter provides that 'No Civil Service Office, employment or position provided for or created under the provisions [of article 42] of the Charter may be vacated, except pursuant to and in conformity with the Civil Service provisions in this article.' Appendix III, Article 43, paragraph 19. The

data processing positions at NES were clearly vacated by the adoption of the SCB contract in violation of the Charter provisions.

> 12. By outsourcing its data processing operations to SCB, and by eliminating those NES jobs forcing its civil service employees to become employees of SCB to retain their positions, by effectively laying off or dismissing its data processing department employees, and by replacing those employees with third party labor, NES abdicated, both in letter and spirit, its responsibilities under Articles 42 and 43 of the Charter, Appendix III, acted illegally, and exceeded its jurisdiction. The Charter gives no authority to the Power Board to outsource a department and delegate its duties as it did. Accordingly the Power [sic] exceeded its jurisdiction in adopting [*12] the SCB contract and that contract is void.

* * * * *

> WHEREFORE, premises considered, the Petitioners pray:

> 4. That the Court hold, after reviewing the record, the Charter provisions and other authorities, and the proof to be presented, that the Power Board acted illegally and exceeded its jurisdiction and violated the provisions of the Metropolitan Charter, Appendix III, Chapters 42 and 43, set forth above, in agreeing to outsource its entire data processing department to a third party.

> 4. [sic] That the Court reverse and hold void the actions of the Power Board…

> 5. That the Court order the displaced employees reinstated as if they had never been outsourced in violation of the Metropolitan Charter.

In the present case, **HN3** the standing requirement imposes a duty upon petitioners to allege "'a particularized injury concretely and demonstrably flowing from the action of the defendants which will be redressed by the remedy sought." Tennessee *Medical Assoc. V. Corker, 1995 Tenn. App. LEXIS 243,* No. 01-A-01-9410-CH00494, *1995 WL 228681 (Tenn. App. 1995)*(quoting *Lugo v. Miller, 640 F.2d 823, 827 (6th Cir. 1981)).* Petitioners must demonstrate to this court that they suffered "a distinct [*13] and palpable injury." *Metropolitan Air Research, 842 S.W.2d at 615.*

Petitioners alleged that the "Power Board effectively laid

off or dismissed the employees." The sole injury suffered by NES employees was the loss of civil service status. Petitioners have not alleged, nor have they suffered, any economic loss or loss of benefits that occurred as a result of the outsourcing decision. The question that arises is whether loss of civil service status alone is sufficient injury under the above-cited authority to confer standing upon petitioners.

In this case, we assume, without deciding, that petitioners possessed the requisite standing to maintain this action. Even upon this assumption, however, we are of the opinion that petitioners' action must fail for the reasons set forth below.

Petitioners' first contention on appeal is that it was not necessary for them to have brought their action pursuant to a petition for common law writ of certiorari because the Board was not exercising a judicial or quasi-judicial function within the meaning of *T.C.A. § 27-8-101*. Accordingly, they argue, their Open Meetings Act claim was properly joined with their original complaint for declaratory [*14] relief.

**HN4** *T.C.A. § 27-8-101* provides:

> The writ of certiorari may be granted whenever authorized by law, and also in all cases where an inferior tribunal, board, or officer exercising judicial functions has exceeded the jurisdiction conferred, or is acting illegally, when, in the judgment of the court there is no other plain, speedy, or adequate remedy.

In *McCallen v. City of Memphis, 786 S.W.2d 633 (Tenn. 1991)*, the Court discussed the above statute **HN5** in evaluating when an action must be brought pursuant to a petition for common law writ of certiorari, as opposed to an action for declaratory judgment. The Court in McCallen relied on the case of *Fallin v. Knox County Board of Commissioners, 656 S.W.2d 338 (Tenn. 1983)*, in holding that the critical inquiry is whether the inferior board exercised either a legislative or an administrative function. *786 S.W.2d at 638*. In the former case an action for declaratory judgment is appropriate, while in the latter case, a petition for common law writ of certiorari is the proper method by which to challenge an administrative decision. *Id. at 639*. In evaluating whether a particular decision is properly characterized as legislative [*15] or administrative, the court stated that the "term administrative is used interchangeably with judicial or quasi-judicial" within the meaning of *T.C.A. § 27-8-101*. *Id. at 638* (citing *Fallin, 656 S.W.2d*

*at 341*). The court also stated that "a crucial test in distinguishing legislative from administrative acts is whether the action taken (resolution or ordinance) makes new law or executes one already in existence....In order to qualify as an administrative, judicial, or quasi-judicial act, the discretionary authority of the governmental body must be exercised within existing standards and guidelines." *786 S.W.2d at 639*.

Because in McCallen, there existed pre-established guidelines requiring the city council to exercise reasonable discretion in electing to grant approval to a proposed planned development, the council's decision to approve the planned development was an administrative decision. *Id. at 640*. Consequently, the Court held, the challenge to the council's decision should have been brought pursuant to a petition for common law writ of certiorari. Id.

The Board is, as petitioners concede, bound by the terms and limitations contained in the Metro Charter. The [*16] charter expressly delineates all of the powers and functions that the Board may, in its discretion, exercise. Thus, in accordance with the principles set forth in McCallen, it is our opinion that the Board's decision to contract with a private sector vendor for its data processing operations was an administrative function. Consequently, we agree with the trial court that petitioners were required to challenge the Board's decision pursuant to a petition for common law writ of certiorari, rather than an action for declaratory judgment. Petitioners' Open Meetings Act claim, which is an original action, may not properly be joined with a petition for writ of certiorari. *Goodwin v. Metropolitan Board of Health, 656 S.W.2d 383, 387 (Tenn. App. 1983)*.

Petitioners argue that the Board's decision to outsource its data processing department violates two asps of the Metro Charter. First, petitioners argue, outsourcing the department contravenes the Charter provisions requiring that NES operations be carried out by civil service employees. Second, petitioners argue that outsourcing the data processing department to SCB amounted to a constructive discharge of NES employees without compliance [*17] with the Charter's procedures for discharge.

**HN6** The scope of review under a common law writ of certiorari is whether the inferior board has exceeded its jurisdiction or has acted illegally, arbitrarily, or fraudulently. *McCallen, 786 S.W.2d at 638*; *Yokley v. State, 632 S.W.2d 123 (Tenn. App. 1981)*. In McCallen, the Court stated:

The court should refrain from substituting its judgment for the broad discretionary authority of the local governmental body. An invalidation of the action should take place only when the decision is clearly illegal, arbitrary, or capricious.

786 S.W.2d at 642.

The Court also noted that "courts are wary of unwarranted judicial intrusions into the performance of ordinary governmental activities." 842 S.W.2d at 619.

Petitioners allege that the Board violated the following provisions of the Metro Charter by replacing NES civil servants with third party labor in contravention of the Charter's mandate that such employees be civil servants:

7. Every position or employment by or with the electric power board of the metropolitan government shall be deemed to be a civil service position, and every employee of said board shall be deemed [*18] to be a civil service employee with the exception of temporary employees, and shall include the present employees of said board and all future employees, and all officers and agents, except that members of the electric power board of the metropolitan government, the general manager, assistant general manager, and the secretary are expressly excluded from the provisions hereof with reference to civil service, and none of said persons, nor the positions which they fill, shall be deemed or considered as under the provisions of civil service.

12. No employee of the electric power board of the metropolitan government, except temporary employees and provisional employees, shall be discharged, suspended for more than ten (10) days nor oftener than twice in any twelve (12) months, or otherwise punished except for just cause and after the filing of charges and trials as hereinbefore provided.

14. The said board shall establish a system of service ratings for the employees. Such service ratings and seniority shall be the principal factors in determining the order of promotion, layoffs, abolition of positions, and reemployment.

Provided, that no corresponding respective civil [*19] service office, employment or position provided for or created under the provisions of the preceding article of this Charter, may be vacated except pursuant to and in conformity with the civil

service provisions of this article.

Conversely, the Board relies upon the following Charter provisions in support of its position that it possessed the authority to enter into the outsourcing contract:

That The Metropolitan Government of Nashville and Davidson County, it is corporate capacity is hereby authorized and empowered to:

6. To make contracts and execute instruments containing such covenants, terms and conditions, as in the discretion of the metropolitan government may be necessary, proper or advisable for the purpose of obtaining loans from any source, or grants, loans, or other financial assistance from any federal agency; to make all other contracts and execute all other instruments, which in its discretion, may be necessary, proper, or advisable, in or for the furtherance of the acquisition, improvement, operation and maintenance, of any electric plant and/or distribution system, and the furnishing of electric service; and to carry out and perform the covenants, [*20] terms and conditions of all such contracts or instruments.

8. To do all acts and things necessary or convenient to carry out the powers expressly given in this article.

After reviewing the Charter provisions and the Board's actions in this regard, we do not find that the Board's decision to outsource its data processing department was clearly illegal, arbitrary, or capricious. The Board's decision stemmed from numerous operational difficulties that had occurred over the course of several years. The record reflects that the data processing operations were inefficient, mismanaged, and costly, resulting in numerous complaints from NES customers. NES employees were not terminated or laid off as a result of the outsourcing decision. Instead, the employees were well provided for and suffered no substantial loss of salary or benefits. The Board simply made a contract, which in its discretion, it felt was necessary and advisable for the improvement and operation of the data processing department. Pursuant to Article 42, § 6 of the Metro Charter, the Board did not act illegally or arbitrarily in making such a decision.

Petitioners' final contention is that the decision to outsource [*21] the department amounted to a constructive discharge of all data processing employees because the employees were never informed that they could remain at NES in the event that they declined to

accept employment with SCB.

We find this contention to be without merit. The facts of the case *sub judice* do not support the elements of a claim for constructive discharge. *Eckard v. Chattanooga State Technical Comm. College, 1991 Tenn. App. LEXIS 926*, No. 03 A01-9106CH-220, *1991 WL 253305* (Tenn. App. Dec. 3, 1991)("A *HN7* finding of constructive discharge requires the determination that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'")(quoting *Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir. 1982)*).

Accordingly, we affirm the judgment of the trial court. Costs on appeal are taxed to petitioners.

HIGHERS, J.

CONCUR:

CRAWFORD, P.J., W.S.

FARMER, J.

---

**End of Document**